**DANA CORPORATION, et al., Plaintiffs,**

v.

**AMERICAN STANDARD, INC., et al., Defendants.**

**No. 3:92–CV–581RM.**

United States District Court, N.D. Indiana, South Bend Division.

Oct. 24, 1994.

Daniel F. Stella, James G. Fausone, Troy R. Taylor, Jeffrey S. Jones, Joseph C. Basta, Dykema Gossett, Detroit, MI, for Dana Corp., General Motors Corp., United Technologies and Warsaw Black Oxide, Inc.

Stephen J. Butler, Jill A. Weller, John H. Beasley, Thompson Hine and Flory, Cincinnati, OH, for American Standard, Inc.

Thomas J. Goeglein, Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, Stephen R. Snyder, Beckman Lawson Sandler Snyder and Federoff, Syracuse, IN, for City of Warsaw.

Alan G. Enderle, Douglas L. Callander, Stephen J. Hessen, Jeffrey D. Swenarton, Kreis Enderle Callander & Hudgins, Kalamazoo, MI, for Clausing Indust., Inc.

Therese A. Czajka, Jacqueline A. Simmons, Ice Miller Donadio and Ryan, Indianapolis, IN, Michael L. Miner, Valentine and Miner, Warsaw, IN, for Da–Lite Screen Co., Inc.

Craig E. Pinkus, Stephen P. Ullrich, Dutton Overman Goldstein Pinkus, Indianapolis, IN, for Dalton Foundries, Inc.

Bradley W. Skolnik, Freihofer Minton Keeler and McClamroch, Indianapolis, IN, for Daymude Development, Inc.

J. Frank Kimbrough, Wilks and Kimbrough, Fort Wayne, IN, for GTE North Inc.

Craig E. Pinkus, Stephen P. Ullrich, Dutton Overman Goldstein Pinkus, Indianapolis, IN, Bruce P. Clark, Karen R. Tallian, Bruce P. Clark and Associates, Munster, IN, for Huber, Hunt & Nichols, Inc.

Thomas A. Barnard, Johnson Smith Densborn Wright and Heath, Indianapolis, IN, Shavan Giffen, Jeffrey Reitmyer, Louis Zednik, K–Mart Corp., Troy, MI, for K–Mart Corp.

R. Lawrence Steele, Edward Joseph Hussey, Hodges and Davis P.C., Merrillville, IN, for Liberty Homes, Inc.

Robert C. Mitchell, Morton Intern., Inc., Chicago, IL, Donald K. Schott, Arthur A. Vogel, Jr., George J. Marek, Quarles and Brady, Madison, WI, for Morton Intern., Inc.

James F. Warchall, Carol A. Doyle, Kristin J. Brandser, Donna M. Kellick, Sidley and Austin, Chicago, IL, for R.R. Donnelley & Sons Co., Inc.

Michael J. Stepanek, Jr., South Bend, IN, for The Shirt Shed, Inc.

Craig M. Buche, Michael F. DeBoni, Yoder Ainlay Ulmer and Buckingham, Goshen, IN, for Syracuse Rubber Products, Inc.

Susan H. Shumway, Shumway and Merle, Southport, CT, for Uniroyal, Inc.

Frank J. Deveau, Donald C. Biggs, Sommer and Barnard, Indianapolis, IN, James E. Utterback, Bristol–Myers Squibb Co., Zimmer, Inc., James S. Butts, Warsaw, IN, for Zimmer, Inc.

*MEMORANDUM AND ORDER*

MILLER, District Judge.

Plaintiffs Dana Corporation, General Motors Corporation, United Technologies Automotive, Inc., and Warsaw Black Oxide, Inc. commenced this action for cost recovery and contribution under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). The plaintiffs seek recovery from the numerous defendants of the past and future response costs at a former landfill site near the City of Claypool, Indiana known as the Lakeland Disposal Service Superfund Site (the "Site"), which is on the Superfund National Priority List. The total costs associated with the investigation and remediation of the Site may approach $20 million. Ten defendants [1] have moved for summary judgment on the issue of whether they are generators under CERCLA.

Oral argument on the motions was heard on September 16, 1994. At that hearing, the plaintiffs orally requested an opportunity to file supplemental materials in support of John Tatum's assumptions and a supplemental brief on the applicable legal standards. Since then, American Standard and Syracuse Rubber have sought leave to file supplemental briefs. The court believes that all parties had more than adequate opportunities to submit written argument before the September 16 hearing, and so denies each of those motions.

In Part I of this opinion, the court discusses the basic facts surrounding the case; discussion of the facts surrounding the parties to the summary judgment motions is reserved for Part III. In Part II–A, the court rejects various parties' suggestions that some different standard governs summary judgment motions in CERCLA cases. The court concludes that the plaintiffs bear the same burden in this case as do all plaintiffs facing summary judgment motions: they must come forth with evidence that would be sufficient to withstand a motion for judgment as a matter of law at trial; nothing more and nothing less. Application of this standard in Part III of the opinion demonstrates that speculative evidence—testimony that an event "could have happened" or was "possible"—does not satisfy this burden.

Part II–B addresses an issue not clearly answered by other courts: what sort of showing, short of direct evidence that a defendant's hazardous waste was disposed of at the site in question, will suffice to allow a CERCLA plaintiff to survive a motion for judgment as a matter of law, and hence survive a summary judgment motion. The court concludes that while the plaintiff must present evidence sufficient to support, by a preponderance of the evidence, a finding that a defendant's hazardous waste was disposed of at the site in question, the plaintiff may satisfy this burden through the use of circumstantial evidence. If the plaintiff demonstrates that the defendant produced a continuous and predictable waste stream that included hazardous constituents of the sort eventually found at the site, and that at least some significant part of that continuous and predictable waste stream was disposed of at the site, the factfinder reasonably may infer that the defendant's hazardous waste was disposed of at the site. If the plaintiff cannot demonstrate such a continuous and predictable waste stream, or is unable to show that a significant part of the defendant's waste stream reached the site, the plaintiff must present some further evidence to justify a reasonable factfinder in inferring that the defendant contributed to the hazardous waste at the site. In Part III of the opinion, the court applies this standard to the claims against the ten moving defendants.

Part II–C of the opinion addresses various objections to expert affidavits and deposition testimony offered by the plaintiffs in opposition to the summary judgment motions.

Because of the parties' extensive disagreement concerning the facts contained in the record, this opinion, in a departure from this court's usual practice, contains extensive footnote references to the record before the court. Sadly, Part III of this opinion demon-

---

1. American Standard, Inc., City of Warsaw, The Dalton Foundries, Inc., GTE North, Inc., Huber, Hunt & Nichols, Inc., K–Mart Corporation, Lib-

erty Homes, Inc., R.R. Donnelley & Sons Company, Inc., Syracuse Rubber Products, Inc., and Zimmer, Inc.

strates a troubling unreliability in the plaintiffs' representations as to what is in the record before the court.

## I. FACTUAL BACKGROUND

Lakeland Disposal Service, Inc. ("LDS") was a waste disposal service that hauled its customers' waste in compactor trucks (standard rear-loaded garbage trucks), roll-offs (large metal box-type containers), and in vacuum-type pumper trucks for liquid wastes. LDS operated the Site as a landfill from about May 1974 until about August 1978. LDS had residential and business, including industrial, customers.[2] The Guide Lamp Division of General Motors was the single largest LDS customer whose waste was disposed of at the Site.[3]

Liquid wastes were hauled in tank trucks and then deposited directly onto the soil at the Site. Drummed wastes were buried at the Site. Roll-off and compactor truck waste were disposed of throughout the surface of the Site. The roll-off and compactor truck waste were bulldozed and covered daily.[4]

David Lindsay became the owner and operator of LDS in 1973 and of the Site in May 1974. Mr. Lindsay's operation of the site continued until June 1976 (the "Lindsay era"). During the Lindsay era, LDS utilized several area landfills to dispose of the waste it collected from its customers: Scott's Landfill, Ransbottom/Custer/Packerton Landfill, Likens/Hoss Hills Landfill, and the Site. LDS hauled sludge waste exclusively to the Site during the Lindsay era.[5] LDS drivers would not use the Site for roll-off and compactor trash if another landfill was more economical, that is, based on the relative proximity of the customer to another landfill.[6]

Mr. Lindsay sold LDS and the Site to Stephen W. Shambaugh on or about June 1, 1976. Mr. Shambaugh owned and operated the Site from June 1, 1976 until August 1978 (the "Shambaugh era"). LDS utilized several area landfills, including Scott's, Ransbottom/Custer/Packerton, Spring Valley/Dunn & Shambaugh, Beer & Slabaugh, Wabash Valley, Adams Center, and the Site. Mr. Shambaugh disposed of what he considered to be trash (roll-off and compactor truck waste) at the other area landfills. As during the Lindsay era, LDS drivers were to take roll-off waste to the landfill nearest the customer. Mr. Shambaugh used the Site for what he considered to be hazardous substances, since he could earn more money disposing of hazardous substances at the Lakeland Landfill.

During both the Lindsay and Shambaugh eras, all bulk liquid industrial waste hauled by LDS was disposed of at the Site.[7] With the exception of drummed paint sludges received from the General Motors Anderson, Indiana plant after April 1977, all drummed waste hauled by LDS was disposed of at the Site. The General Motors drummed paint sludges were disposed of at the Spring Valley Landfill.[8]

Mr. Shambaugh recalled disposing of trash at the Site during a six month period of time in 1977 or 1978.[9] Trash was accepted because Mr. Shambaugh believed he needed to mix trash with General Motors' hazardous paint sludge that was disposed of at the Site. A trench was excavated for the purpose of mixing trash with General Motors' paint sludge. LDS also hauled trash to other landfills while the trench was open.[10] Once the

2. Lindsay Dep., at 61–63.

3. *Id.*, at 27, 34, 74; Shambaugh Dep., at 80.

4. Lester Dep., at 16, 102–103; Shambaugh Dep., at 173–174; Conley Dep., at 105–110, 115–16; Regenos Dep., at 53, 81, 100–101, 179.

5. Lindsay Dep., at 201–202; Lester Dep., 87–88.

6. Lindsay Dep., at 88–89, 196; Shambaugh Dep., at 378–379, 384–385, 387; Lester Dep., at 63–64; Tillman Dep., at 11–12; Call Dep., at 28, 57–59; Conley Dep., at 23–24; Fruit Dep., at 41–42.

7. Lindsay Dep., at 202, 316–317, 357; Shambaugh Dep., at 189, 208–209.

8. Shambaugh Dep., at 198–203, 714–715; Lester Dep., at 147.

9. Shambaugh Dep., at 64–65; Lester Dep., at 86–90.

10. Shambaugh Dep., at 64–65, 699–700.

trench was full, most roll-off and compactor truck trash went to the Ransbottom Landfill at Packerton.

Virtually all LDS drivers agree that a substantial amount of roll-off waste went to other landfills during the Shambaugh era. Paul Phillipy testified that "a lot" of trash went to the Ransbottom Landfill and to Scott's Landfill.[11] Mr. Tillman testified that from 1976 through 1978 he "normally went to Packerton [Ransbottom]."[12] Mr. Tillman did not think that he ever disposed of trash at the Site during those years.[13] Most of the waste hauled from customers located from north Warsaw to the south went to the Ransbottom Landfill.[14]

By late spring or early summer of 1978, the Site no longer accepted any roll-off and compactor truck waste (trash); all roll-off and compactor truck waste hauled by LDS went to other landfills. The Site was closed in August 1978.[15]

With a few exceptions, the majority of LDS records do not indicate at which area landfill a particular customer's waste was disposed.[16] First, hundreds of landfill receipts given LDS by area landfills indicate that LDS hauled customer waste to the other landfills. Most of these landfill receipts do not indicate the customer from whom LDS hauled the waste, but some do specifically identify the source of the waste.[17] Second, the "Kosciusko County Landfill Receipts"—used by the Site while it was open to the general public from January through March 1975—indicate that a particular customer's waste was disposed of at the Site.[18] Third, the SPC–17 liquid waste hauler reports[19] also indicate that a particular customer's liquid waste was hauled to the Site.

## II. GENERAL DISCUSSION

### A. Summary Judgment Standard

Several defendants contend that because the plaintiffs did not file a "Statement of Genuine Issues" with their answer brief in compliance with Rule 56.1 of the Local Rules for the Northern District of Indiana, the court should "assume that the fact[s] as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy". N.D.Ind.L.R. 56.1. The Seventh Circuit has "endorsed the exacting obligation" such a rule imposes on the non-moving party, remarking that "district courts are not obliged in our adversary system to scour the record looking for factual disputes." *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (citing cases). The Seventh Circuit has upheld strict enforcement of such a rule by the district courts, *id.*, but whether to strictly apply such a rule is within the district court's sound discretion. *Waldridge v. American Hoechst Corp.*, 24 F.3d at 923, (citing *McGann v. Northeast Illinois Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1178 n. 3 (7th Cir.1993); *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir.1992)).

This court's June 28, 1994 order afforded the plaintiffs an opportunity to comply with District Rule 56.1 in an effort to avoid scouring the massive record before it in search of factual disputes. The court believes that strict application of District Rule 56.1 in this particular cause would not further the ends of justice, and, therefore, the court will not assume that the facts as claimed by the defendants and supported by admissible evidence are deemed admitted.

11. Phillipy Dep., at 18, 51.

12. Tillman Dep., at 36.

13. *Id.*, at 35.

14. Shambaugh Dep., at 387; Lester Dep., at 87–89; Tillman Dep., at 35–36, 55–57, 60, 66, 68, 70, 72, 81, 91, 94, 98, 166, 168 (sixty to seventy percent went to Packerton); Conley Dep., at 116–117 ("probably fifty percent" went to landfills other than the Site).

15. Shambaugh Dep., at 501.

16. *Id.*, at 73, 575.

17. Conley Dep., at 56–66.

18. Lindsay Dep., at 64–68; *id.*, Exh. C.

19. The Indiana Stream Pollution Control Board required waste haulers to log the transportation and disposal of liquid waste beginning on January 1, 1976. Mr. Lindsay and Mr. Shambaugh both complied with those requirements.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

No genuine issue of material fact exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). No genuine issue as to any material fact is created by "evidence of purportedly disputed facts if those facts are not plausible in light of the entire record." *See Czajkowski v. City of Chicago, Illinois,* 810 F.Supp. 1428, 1432 (N.D.Ill.1992) (citing *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991)).

The parties cannot rest on mere allegations in the pleadings or upon conclusory allegations in affidavits. *See, e.g., CBS, Inc. v. Henkin,* 803 F.Supp. 1426, 1430 (N.D.Ind. 1992) (citing cases). The court must view the record and draw all reasonable inferences from the evidence in favor of the non-moving party, and where a fact is disputed, the non-moving party must show that the disputed fact is material under the applicable law. *Hartford Acc. & Indem. Co. v. Chicago Housing Authority,* 12 F.3d 92, 95 (7th Cir. 1993); *Titran v. Ackman,* 893 F.2d 145 (7th Cir.1990); *Conery v. Bath Assoc.,* 803 F.Supp. 1388, 1392–1393 (N.D.Ind.1992); *see*

*also Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1002 (7th Cir.1994) ("Rule 56 requires the party opposing a summary judgment motion to come forward with some evidence showing the existence of . . . a factual dispute."), *petition for cert. filed* (U.S. Aug. 2, 1994) (No. 94–547). The non-movant's allegations must be taken as true and given the benefit of the doubt when in conflict with those alleged by the party moving for summary judgment. *Bishop v. Wood,* 426 U.S. 341, 347–48, 96 S.Ct. 2074, 2078–79, 48 L.Ed.2d 684 (1976); *Thornton v. Evans,* 692 F.2d 1064, 1074–75 (7th Cir.1982); *United States v. Wedzeb Enterprises, Inc.,* 809 F.Supp. 646, 649 (S.D.Ind.1992).

■ Summary judgment is appropriate "when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof." *Common v. Williams,* 859 F.2d 467, 469 (7th Cir.1988); *see also United States v. Bethlehem Steel Corp.,* 829 F.Supp. 1023, 1026 (N.D.Ind.1993). The non-moving party must come forward with more than a mere scintilla of evidence in support of its position, *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, and must establish that there is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356.[20]

■ The plaintiffs contend that an "especially stringent" summary judgment standard applies in CERCLA actions because CERCLA is a remedial statute and courts broadly construe CERCLA so as to achieve its objectives. *See* Brief in Opposition, pp. 16–17 (citing *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 845–46 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); *United*

---

**20.** The plaintiffs stated that they have not attempted to respond to all the "points" raised by the defendants and with which they disagree, but have chosen to "deal with only the most egregious of such points." The plaintiffs contend that in so doing they are not waiving any objections to other "points" raised by the defendants, and ask the court to inform them if the court believes they have waived any objections. *See* Brief in Opposition, p. 1 n. 1. Rule 56 teaches

that if a non-moving party fails to "set forth specific facts showing that there is a genuine issue for trial", then summary judgment, if appropriate, should be entered against the nonmoving party. Fed.R.Civ.P. 56(e). Thus, to the extent the plaintiffs have failed to respond to any "points" showing that there is a genuine issue as to any material fact, the plaintiffs have waived their right to respond.

*States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3rd Cir.1992); *United States v. Allied–Signal, Inc.*, 820 F.Supp. 1118, 1119 (S.D.Ind.1991); *United States v. Kramer*, 757 F.Supp. 397, 416–17 (D.N.J.1991)). The cases cited by the plaintiffs do no more than support the proposition that CERCLA is a remedial statute to be construed broadly; they do not support the plaintiffs' contention that summary judgment motions in CERC-LA actions are subject to "especially stringent standards" in comparison to other cases.

As one district court has explained, "[T]he Act [CERCLA] cannot operate in a vacuum.... Federal Rules of Civil Procedure are an instrumental tool in orchestrating litigation through the courts, and nothing in CERCLA suggests that the rules be subordinated to the Act." *Rhodes v. County of Darlington, S.C.*, 833 F.Supp. 1163, 1198 (D.S.C.1992); *see also CBS, Inc. v. Henkin*, 803 F.Supp. 1426 (N.D.Ind.1992) (applying Fed.R.Civ.P. 56 standards in a CERCLA action); *Akzo Coatings, Inc. v. Aigner Co.*, 803 F.Supp. 1380 (N.D.Ind.1992) (same), *aff'd in part, rev'd in part on other grounds*, 30 F.3d 761 (7th Cir.1994); *Amcast Industrial Corp. v. Detrex Corp.*, 779 F.Supp. 1519, 1524–25 (N.D.Ind.1991) (same), *aff'd in part, rev'd in part on other grounds*, 2 F.3d 746 (7th Cir.1993), *and cert. denied*, —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994). The summary judgment standard is not heightened in a CERCLA cause of action.

### B. CERCLA Liability

■ CERCLA liability is established if (1) the site in question was a "facility", as defined in 42 U.S.C. § 9601(9); (2) the defendant is a responsible person under § 9607(a); (3) a release or a threatened release of a hazardous substance has occurred; and (4) the release or threatened release has caused the plaintiff to incur response costs. *Kerr–McGee Chemical v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir.1994); *Environ-*

*mental Transp. Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir.1992); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2nd Cir.1985); *United States v. Wedzeb Enterprises*, 809 F.Supp. 646, 652 (S.D.Ind.1992). At issue in the defendants' motions for summary judgment is whether the defendants are "responsible persons" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). A "responsible person" includes:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances....

42 U.S.C. § 9607(a); *see also United States v. Wedzeb Enterprises*, 809 F.Supp. at 654 n. 10.

■ To establish CERCLA liability, the plaintiffs must prove, by a preponderance of the evidence,[21] that each defendant's waste was disposed of at the Site and that hazardous substances similar to those found in the defendants' waste were present at the Site at the time of release.[22] *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160, 169 n. 15 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Massachusetts v. Blackstone Valley Elec. Co.*, 808 F.Supp. 912, 914 (D.Mass.1992); *City of New York v. Exxon Corp.*, 766 F.Supp. 177, 191 (S.D.N.Y.1991); *United States v. Marisol, Inc.*, 725 F.Supp. 833, 840 (M.D.Pa.1989) ("The minimal causal nexus required by CERCLA is met when the plaintiff proves by a preponderance of the evidence that the defendant's hazardous waste was deposited at the site and that the substances contained in the defendant's waste were also found at the site." (citation omitted)); *O'Neil v. Picil-*

---

**21.** "Preponderance of the evidence" is "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it," *Hale v. Department of Transp., F.A.A.*, 772 F.2d 882, 885 (Fed.Cir. 1985); or "evidence which shows that the fact to be proved is more probable than not." *Gardner*

*v. Wilkinson*, 643 F.2d 1135, 1137 (5th Cir.1981); *see also King v. General Elec. Co.*, 960 F.2d 617, 623–624 (7th Cir.1992).

**22.** Clearly, this presupposes that the defendants' waste contained hazardous substances.

*lo,* 682 F.Supp. 706, 718 n. 2 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Wade,* 577 F.Supp. 1326, 1332–1333 (E.D.Penn. 1983); *see also United States v. Alcan Aluminum Corp.,* 964 F.2d at 266 ("the Government must simply prove that the defendant's *hazardous substances* were deposited at the site") (emphasis added)). The plaintiffs need not trace the ownership of each generic chemical compound found at the Site. *See, e.g., United States v. Alcan Aluminum Corp.,* 964 F.2d at 264; *United States v. Monsanto Co.,* 858 F.2d 160, 169–70 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2nd Cir.1985); *Massachusetts v. Blackstone Valley Elec. Co.,* 808 F.Supp. at 915; *Trinity Indus. Inc. v. Dixie Carriers, Inc.,* No. 90–2349, 1992 WL 161123, at \*5 (E.D.La. June 24, 1992).

■ The plaintiffs incorrectly imply that the defendants bear the burden of showing that none of their hazardous waste was disposed of at the Lakeland site, citing *Massachusetts v. Blackstone Valley Elec. Co.,* 808 F.Supp. 912. The plaintiffs have the burden of proof as to each element of their claim against the defendants. The defendants, as the moving parties, need only establish that the plaintiffs have insufficient evidence to prove each element of their claims; the defendants have no burden to prove that the plaintiffs' claims are not true. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324–325, 106 S.Ct. 2548, 2553–2554, 91 L.Ed.2d 265 (1986); *Pommier v. Peoples Bank Marycrest,* 967 F.2d 1115, 1118 (7th Cir.1992).

■ Under CERCLA, a "hazardous substance" is either a U.S. EPA-designated "element, compound, mixture, solution, or substance," CERCLA § 101(14)(B), 42 U.S.C. § 9601(14)(B), or a hazardous waste having characteristics listed under one of several statutes. CERCLA § 101(14)(C), 42 U.S.C. § 9601(14)(C); *see also United States v. Serafini,* 750 F.Supp. 168, 170 (M.D.Pa.1990). A waste need not contain a certain concentration of a listed hazardous substance to be considered a CERCLA hazardous waste.

*See, e.g., United States v. Alcan Aluminum Corp.,* 964 F.2d at 264; *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d at 669; *Massachusetts v. Blackstone Valley Elec. Co.,* 808 F.Supp. at 915 ("liability does not turn on the disposal of a particular quantity of a hazardous substance"); *United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 538 (N.D.N.Y.1991); *City of New York v. Exxon Corp.,* 744 F.Supp. 474, 483 (S.D.N.Y.1990) (CERCLA liability attaches "regardless of the concentration of the hazardous substances present in a defendant's waste") (citations omitted), *opinion adhered to on reconsideration by,* 766 F.Supp. 177 (S.D.N.Y.1991).

The plaintiffs attempt to distinguish this cause from the decisions in *United States v. Atlas Minerals & Chemicals, Inc.,* No. 91–5118, 1993 WL 518421 (E.D.Pa. Dec. 7, 1993), *B.F. Goodrich Co. v. Murtha,* 840 F.Supp. 180, 184 (D.Conn.1993), *B.F. Goodrich Co. v. Murtha,* 815 F.Supp. 539 (D.Conn.1993), *Gallagher v. T.V. Spano Bldg. Corp.,* 805 F.Supp. 1120 (D.Del.1992), and *Barnes Landfill, Inc. v. Town of Highland,* 802 F.Supp. 1087 (S.D.N.Y.1992), but these cases are more closely analogous to this action than the cases upon which the plaintiffs rely. In *United States v. Atlas Minerals & Chem.,* No. 91–5118, 1993 WL 518421, at \*6, the court found that the plaintiffs had presented no evidence that a defendant's office trash contained hazardous substances. The only "evidence" presented was an expert's opinion about composition of the defendant's office waste, based on the expert's knowledge of the general composition of office waste. *Id.* at \*2.

In *Gallagher v. T.V. Spano Bldg. Corp.,* 805 F.Supp. at 1128, the summary judgment was granted to the defendant because the plaintiffs failed to present evidence that the defendant disposed of hazardous substances at the site in question. The record established merely that the defendant disposed of "site preparation and construction debris". 805 F.Supp. at 1130. The court determined that the references to the release of hazardous substances—an EPA survey revealed the presence of some hazardous substances at the site, but there was no evidence indicating how or when those substances came to be at

the site—constituted a "mere scintilla of evidence". 805 F.Supp. at 1130 and n. 8; *see also Barnes Landfill v. Town of Highland,* 802 F.Supp. 1087 (complaint dismissed where defendant was known to have contributed only paper and kitchen garbage).

The plaintiffs challenge the applicability of *B.F. Goodrich v. Murtha,* 840 F.Supp. 180, questioning the factual basis upon which the court granted summary judgment. In ruling on the summary judgment motion, the court found that certain defendants could not be held liable if they contributed only ordinary items of commerce—e.g., tires, used bottles of photocopy toner, white-out, household cleaners—because those items were not specifically listed as hazardous substances by the EPA. 840 F.Supp. at 187–90. The court stated, "[a]bsent a finding by EPA that a particular product warrants classification as a HS [hazardous substance], 42 U.S.C. Sec. 9602, it cannot be found that the product, notwithstanding its constituent elements, is an HS or HW [hazardous waste]." 815 F.Supp. at 546 (citing *United States v. Serafini,* 750 F.Supp. 168 (M.D.Pa.1990) (holding that the defendant could not be held liable under CERCLA for depositing waste which, although not itself a hazardous substance, would release listed hazardous substances when burned)). Evidence that municipal defendants contributed nothing more than municipal solid waste to the site was not a sufficient basis for holding the municipal defendants liable. *B.F. Goodrich v. Murtha,* 840 F.Supp. at 187–88.

The *Murtha* court ruled that the expert's conclusion, based upon knowledge of the composition of generic municipal, commercial, and household solid waste, was insufficient to prove that the municipal defendants' waste necessarily contained hazardous substances. 840 F.Supp. at 187–89. The court reasoned:

> The soundness of the ... claim must be judged on the Brown [expert] affidavit.... Neither the complaint nor the record created for deciding the summary judgment motions identifies a specific HS [hazardous substance] in the MSW [municipal solid waste] of any MG [municipal generator].

840 F.Supp. at 188. The court concluded that the municipal defendants could not be held liable under CERCLA without further evidence of the type and quantity of materials they allegedly disposed. 840 F.Supp. at 189.

As to the non-municipal defendants, the court required direct evidence that a specific hazardous substance had been disposed of at the site. *See, e.g.,* 840 F.Supp. at 191. The court determined that, assuming the non-municipal defendants had handled listed hazardous substances, the plaintiffs had not provided sufficient evidence that the defendants actually disposed of the hazardous substances at the site in question. *Id.*

The defendants in these cited cases—*see, e.g., United States v. Atlas Minerals & Chem.,* No. 91–5118, 1993 WL 518421, at *6; *Barnes Landfill v. Town of Highland,* 802 F.Supp. 1087—produced non-industrial, essentially nonhazardous waste streams. Thus, no reasonable inference concerning disposal of a hazardous substance could be drawn from the fact of known shipment or disposal of waste. Similarly, the plaintiffs in the cited cases offered no specific or direct evidence that the defendants disposed of a known hazardous substance at the site in question. The courts required the plaintiffs to come forward with more than general allegations and conclusory affidavits to survive summary judgment; the courts required the plaintiffs to present evidence of disposal of a known hazardous substance at the site in question.

In contrast, with the exception of *New York v. Shore Realty Corp.,* 759 F.2d 1032 (2nd Cir.1985), a § 107(a)(1) owner case in which generator liability was not at issue, all of the cases cited by the plaintiffs, *see* Brief in Opposition, pp. 24–27, involved a defendant that generated a predictable and relatively consistent hazardous substance waste stream. *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (generator defendants shipped drums and containers of known hazardous substances to site); *United States v. Schmalz,* 823 F.Supp. 644 (E.D.Wis.1993) (defendant paper mill generated fly ash waste); *Massachusetts v.*

*Blackstone Valley Elec. Co.*, 808 F.Supp. 912 (defendant electric utility company generated gas production waste); *Arizona v. Motorola, Inc.*, 805 F.Supp. 742 (D.Ariz.1992) (defendant manufactured aircraft engines generating a metal grinding sludge); *Trinity Indus., Inc. v. Dixie Carriers, Inc.*, No. 90–2349, 1992 WL 161123 (E.D.La. June 24, 1992) (defendant industrial barge cleaner generated benzene-laden waste oils); *United States v. New Castle County*, 769 F.Supp. 591 (D.Del.1991) (defendant manufactured compounded plastics); *United States v. Kramer*, 757 F.Supp. 397 (D.N.J.1991) (defendants generated industrial wastes); *United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531 (defendant manufactured aluminum generating an industrial emulsion fluid); *City of New York v. Exxon Corp.*, 744 F.Supp. 474 (S.D.N.Y.1990), *opinion adhered to on reconsideration by* 766 F.Supp. 177 (S.D.N.Y.1991) (defendant Alcan manufactured aluminum products); *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361 (D.N.H.1985) (defendants disposed of drums containing hazardous substances); *United States v. Carolawn*, 21 Env't Rep.Cas. (BNA) 2124, 1984 WL 178909 (D.S.C. June 15, 1984) (Mobil Oil generated water-based paint waste).

In the cases cited by the plaintiffs, a lower level of proof was required to establish that the defendants disposed of hazardous substances at the site in question. First, because the defendants' waste streams contained known hazardous substances, the courts could infer from the fact of disposal of waste that the defendants disposed of hazardous substances. Such an inference is not permissible with respect to defendants that do not generate waste streams containing known hazardous substances.

Second, *Massachusetts v. Blackstone Valley Elec. Co.*, 808 F.Supp. 912 (D.Mass.1992), *Arizona v. Motorola, Inc.*, 774 F.Supp. 566 (D.Ariz.1991), and *United States v. New Castle County*, 769 F.Supp. 591 (D.Del.1991), do not support the plaintiffs' claim of sufficiency of their evidence that the defendants disposed of waste at the Site. In those cases, drivers for the waste hauler (as well as the

facility's owner in *Motorola*), testified that they disposed of the defendants' waste at the CERCLA facility. *See Massachusetts v. Blackstone Valley Elec. Co.*, 808 F.Supp. at 915; *Arizona v. Motorola*, 774 F.Supp. at 576; *United States v. New Castle County*, 769 F.Supp. at 599. The defendant in *Blackstone Valley*, 808 F.Supp. at 915, did not dispute that its waste was taken to the facility; the defendant in *Motorola*, 774 F.Supp. at 575, admitted that its waste was disposed of at the facility. These cases thus differ from the case at bar with respect to the defendants that dispute that their waste was disposed of at the Site.

The plaintiffs contend that *B.F. Goodrich v. Murtha*, 840 F.Supp. 180, cited by several defendants, is distinguishable on three grounds. First, the plaintiffs contend that the defendants in the case at bar contributed at least some waste to the Site. As set forth below in the discussions of each defendant, this contention is not accurate with respect to all defendants. Second, the plaintiffs contend *Murtha* was based on an erroneous premise "that a waste containing admittedly hazardous substances cannot be considered 'hazardous' under CERCLA unless it is specifically described as such by the U.S. EPA." [23] The plaintiffs contend that "the mere fact that a generator's hazardous substances are mixed into generic wastes that are not specifically named as such" cannot save a defendant from CERCLA liability.[24]

The plaintiffs overstate the cases cited to support their contention; the nature of the waste involved in each case is radically different from the nature of the wastes allegedly involved in this cause. "To distinguish a waste *solution* or *mixture* from its hazardous constituents defies reason." *United States v. Carolawn Co.*, 21 Env't Rep.Cas. (BNA) 2124, 2126 (D.S.C. June 15, 1984) (emphasis added).

If a chemical reaction would be required to cause a party's non-hazardous waste to generate a hazardous substance, then the likelihood that the reaction could occur at the CERCLA site must be established in

---

**23.** Pltfs' Brief in Opposition to Mots. for Sum. Judg., p. 30.

**24.** Brief in Opposition, p. 23.

order to hold the party liable for disposing of a hazardous substance.

\* \* \* \* \* \*

When a defendant's waste is a mixture, like lead-based paint, the dissociation of the hazardous substance from the waste can be presumed and the party disposing of the mixture should be held liable under CERCLA. . . .

*United States v. New Castle County*, 769 F.Supp. at 596–97; *see also Arizona v. Motorola*, 774 F.Supp. at 568–569 (holding grinding sludge composed of either hydraulic oil or water-based coolant and various metal grinding particles was hazardous substance); *United States v. Alcan Aluminum Corp.*, 755 F.Supp. at 540 (waste emulsion mixture of water and mineral oil containing concentrations of metal was hazardous substance); *United States v. Carolawn Co.*, 21 Env't Rep. Cas. (BNA) 2124 (D.S.C. June 15, 1984) (court held water-based paint wastes were hazardous substances); *cf. United States v. Serafini*, 750 F.Supp. 168 (M.D.Pa.1990) (holding that the defendant could not be held liable under CERCLA for depositing waste which, although not itself a hazardous substance would release listed hazardous substances when burned). The plaintiffs have presented no evidence that each defendant's waste was a mixture or solution containing hazardous substances similar to those in the cases cited by the plaintiffs from which a release of a hazardous substance could reasonably be inferred.

The plaintiffs contend that *Serafini* provides no guidance in this cause, because none of the materials sent by the defendants have a similar requirement for their release into the environment.[25] To even reach this contention, the plaintiffs first must present some evidence that each defendant's waste hauled to the Site contained hazardous substances. *See, e.g., Jastram v. Phillips Petroleum Co.*, 844 F.Supp. 1139, 1140 (E.D.La.1994) (holding the defendants not liable under CERCLA for the costs of cleanup of brine or salt water,

which were not defined as CERCLA hazardous substances), *clarification denied,* No. CIV. A. 92–0763, 1994 WL 90391 (E.D.La. Mar. 16, 1994).[26]

Summarizing the discussion of the summary judgment and CERCLA standards, the plaintiffs' obligation under Rule 56 is no different because this is a CERCLA case. The plaintiffs must present evidence which, when all reasonable inferences are drawn in the plaintiffs' favor, is sufficient to allow a trier of fact to find that it is more likely than not that a given defendant sent identifiable hazardous waste to the site in question. As in every summary judgment case, the defendants have no burden of proving the contrary, but merely must point out the alleged defects in the plaintiffs' proof. That CERCLA is a remedial statute does not affect the operation of Rule 56.

▮▮▮ Because reasonable, permissive inferences must be drawn in the plaintiffs' favor at the summary judgment stage, the plaintiffs need not present eyewitness testimony providing a complete chain of custody of hazardous waste from a defendant to the landfill. It is sufficient if circumstances allow an inference from which a trier of fact could make a finding by a preponderance of the evidence. So, in several cases cited by the plaintiffs, courts have held that if the plaintiffs show that a defendant generated a predictable and relatively consistent waste stream that included hazardous waste of a sort ultimately found at the site, and that defendant's waste was regularly taken to the site, an inference that the waste found at the site came from that defendant is permissible and is sufficient to defeat a summary judgment motion, even if it would not ultimately be sufficient to persuade the trier of fact.

▮▮▮ As in any summary judgment case, the plaintiffs must make their showing, whether directly or indirectly, through evidence that has probative value, meaning there must be something more than testimony that something "could be" or "might

---

**25.** Brief in Opposition, p. 28.

**26.** Although the *Jastram* court denied the defendant summary judgment on the issue whether the defendant's pit or production sludges were

hazardous substances, the court did not explain the basis for its conclusion that genuine issues of material fact existed; therefore, the opinion provides no guidance in that regard.

be"—in other words, there must be evidence of something beyond a witness effectively saying that "anything's possible", because such evidence is not sufficient to support a finding.

## C. Objections to the Plaintiffs' Evidence

Several defendants have objected to the plaintiffs' use of certain evidence: (1) Robert Call's deposition testimony; (2) the Smith Affidavit; and (3) the Tatum Affidavit. These objections will be addressed in turn.[27]

### 1. Deposition Testimony of Robert Call

Various defendants, including Huber, Hunt & Nichols, K–Mart, and Zimmer, object to the use of Robert Call's deposition testimony because (1) Mr. Call's testimony lacks credibility, and (2) Mr. Call's deposition was not completed.

■ Determinations of the credibility of witnesses and the weight of the evidence are not within the court's province when considering a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus, the issue of Mr. Call's credibility is not before the court and may not be decided by the court when ruling on the summary judgment motions.

■ The defendants have offered no authority supporting their contention that the court cannot consider Mr. Call's testimony because it was not completed. Mr. Call's deposition was taken over a full two days. The plaintiffs represent that every party had an opportunity to cross-examine Mr. Call. It appears from the transcript of Mr. Call's deposition that Huber Hunt & Nichols, K–Mart, and Zimmer had an opportunity to, and did in fact, cross-examine Mr. Call. The court is unaware of any authority supporting these defendants' contention that Mr. Call's testimony should be disregarded. If further examination was needed for summary judg-

ment purposes, Rule 56(f) should have been invoked.

Accordingly, the court finds that the defendants' objections to the use of Mr. Call's testimony should be overruled.

### 2. Expert Affidavits [28]

■ Expert testimony is not automatically admissible evidence. *See, e.g., Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1393 (W.D.Mo.1994), *on reconsideration in part on other grounds sub nom., Thomas (Elaine) v. FAG Bearings Corp.*, 860 F.Supp. 663 (W.D.Mo.1994); *Amcast v. Detrex Corp.*, 779 F.Supp. 1519, 1534 (N.D.Ind.1991) (experts rarely allowed to determine questions of law), *aff'd in part, rev'd in part on other grounds*, 2 F.3d 746 (7th Cir.1993), *and cert. denied*, —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); *Toro Co. v. Krouse, Kern & Co.*, 644 F.Supp. 986, 989 (N.D.Ind. 1986), *aff'd*, 827 F.2d 155 (7th Cir.1987). In general, evidence submitted for summary judgment must be admissible at trial. Fed. R.Civ.P. 56(e) ("affidavits ... shall set forth such facts as would be admissible in evidence"); *McFeely v. United States*, 700 F.Supp. 414, 418 n. 1 (S.D.Ind.1988). Thus, facts and opinions stated in an expert's affidavit may be considered only if they would be admissible under the Federal Rules of Evidence. *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335, 1342 (S.D.Ind.1992), *aff'd*, 9 F.3d 607 (7th Cir.1993); *Toro Co. v. Krouse, Kern & Co.*, 644 F.Supp. at 988. To be admissible, expert testimony must satisfy Fed.R.Evid. 401; additionally, the expert must be qualified as an expert by knowledge, skill, experience, training, or education, Fed. R.Evid. 702; the court must find that scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact at issue, Fed.R.Evid. 702; and the facts or data upon which the expert bases an opinion or inference must be of a type reasonably relied upon by experts in the particular field. Fed. R.Evid. 703.

---

**27.** Objections were made with respect to the Weltzin Affidavit as well. Because the court's decision does not rely on the Weltzin affidavit, the court need not address those objections.

**28.** The court rejects Huber Hunt & Nichols' objection that the plaintiffs' use of the experts' affidavits and exhibits is barred by noncompliance with the court's December 4, 1992 Order on Discovery.

If an expert's opinion is so fundamentally unsupported that it cannot assist the trier of fact, the court should exclude that expert's opinion. *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir.1989). Unsupported facts do not provide a sufficient basis from which a reasonable juror could find the expert's opinion more certain or reasonable. *Porter v. Whitehall Laboratories*, 791 F.Supp. at 1348–49. Whether an expert's opinion is supported by an adequate basis is a matter of law for the court to decide. 791 F.Supp. at 1348; *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829 (D.C.Cir.1988), *cert. denied*, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989). The court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, —, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). The court should exclude an expert's opinion that is not supported by a sufficient basis. *Hurst v. United States*, 882 F.2d at 311.

As the Supreme Court enunciated in *Daubert*:

The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."

— U.S. at —, 113 S.Ct. at 2795 (citation omitted). "Proposed testimony must be supported by appropriate validation—i.e. 'good grounds' based on what is known." *Id.* As the Seventh Circuit stated:

Rule 56(e) ... provides that affidavits supporting and opposing motions for summary judgment must do more than present

something that will be admissible in evidence. They shall "set forth facts" and by implication in the case of experts (who are not "fact witnesses") a process of reasoning beginning from a firm foundation. "It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment." An "opinion has significance proportioned to the sources that sustain it." An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.

*Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989) (citations omitted)[29]; *see also Porter v. Whitehall Laboratories*, 791 F.Supp. at 1347–49 (unsupported expert opinions are insufficient to survive summary judgment motion) (collecting cases); *State Farm Fire & Cas. Co. v. Miles*, 730 F.Supp. 1462, 1472 (S.D.Ind.1990), *aff'd*, 930 F.2d 25 (7th Cir. 1991) (summary judgment cannot be avoided by presenting conclusory testimony of an expert witness).

Expert opinions premised upon speculation and conjecture are insufficient to create a genuine issue of material fact to survive summary judgment. *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1393 (W.D.Mo.1994), *on reconsideration in part on other grounds sub nom., Thomas (Elaine) v. FAG Bearings Corp.* 860 F.Supp. 663 (W.D.Mo.1994).[30] "When basic foundational conditions themselves are conjecturally premised, it then behooves a court to remove the answer from one of admissible opinion to one of excludable speculation." *Id.* (citation omitted).

The court must, can, and will separate and disregard any legal conclusion opined by the experts from their statements of fact and expert opinion. *See, e.g., Pfeil v.*

29. In *Mid–State Fertilizer*, 877 F.2d at 1339–1340, the Seventh Circuit held that an economist's opinion, unsupported by any factual basis, created no question of fact sufficient to survive a summary judgment motion. The expert in that case, however, "presented nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypothesis considered and rejected." 877 F.2d at 1339.

30. The *Thomas* plaintiff sought recovery against several defendants that allegedly disposed of a hazardous substance through an underground pathway. The plaintiff relied on an expert's opinion that the pathway, through which the disposal allegedly occurred, existed. The court did not consider the opinion because it was premised upon assumed hypothetical facts.

*Rogers,* 757 F.2d 850, 862 (7th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986) (legal opinion is not a recitation of fact to which an affiant is competent to testify, and may be disregarded); *Zepik v. Ceeco Pool and Supply, Inc.,* 118 F.R.D. 455, 462 (N.D.Ind.1987) (court may not consider affiant's statements as to the law or legal conclusions), *aff'd in part, rev'd in part sub nom. Zepik v. Tidewater Midwest, Inc.,* 856 F.2d 936 (7th Cir.1988).

### a. The Smith Affidavit

The plaintiffs offer the Smith affidavit in support of their claim that each defendant disposed of hazardous substances at the Site between 1974 and 1978.[31] The plaintiffs contend that "Smith's testimony explains what constituents of each defendant's waste are 'hazardous substances' within the meaning of CERCLA and then matches those constituents to the hazardous substances ... [at the Site]."[32]

The defendants object to the Smith affidavit primarily on the grounds that Mr. Smith's opinions lack a sufficient foundation, and that Mr. Smith lacks personal knowledge, or assumes, that the defendants sent hazardous waste to the Site. The plaintiffs contend that the defendants' objections are founded upon the defendants' belief that the plaintiffs must prove either (1) that a "specific load of each defendant's waste containing a specific hazardous substance went to Lakeland"; or (2) that each defendant produced an unvarying waste stream comprised solely of hazardous substances which LDS hauled to Lakeland."[33] The plaintiffs contend that they need only prove under CERCLA that each defendant's waste was shipped to the Site, and that hazardous substances similar to those contained in each defendant's waste were present at the Site at the time of release.[34]

■ The plaintiffs misunderstand what the law requires them to prove to prevail. The plaintiffs bear the burden on two factual issues: (1) whether each defendant's hazardous waste was disposed of at the Site; and (2) whether the hazardous substances similar to those contained in each defendant's waste were present at the Site. First, if the plaintiffs do not prove that each defendant's hazardous waste was disposed of at the Site, the court need not reach the second issue—whether hazardous substances similar to those contained in each defendant's waste were present at the Site. Second, logic dictates that if the plaintiffs cannot prove (even by inference) what, if any, hazardous substances were in each defendant's waste, then the plaintiffs cannot prove that hazardous substances similar to those contained in each defendant's waste were present at the Site.

■ Mr. Smith has no personal knowledge that any defendant disposed of a hazardous substance at the Site and, therefore, bases this crucial assumption on the discovery taken in this cause, particularly the deposition testimony of former LDS owners, drivers, and other employees. *See* Fed.R.Evid. 703. The testimony upon which Mr. Smith relies must be sufficient to establish that the defendants disposed of a hazardous substance at the Site to provide an adequate foundation for Mr. Smith's opinion. As discussed below with respect to the individual defendants, the deposition testimony and other evidence is insufficient to prove that each defendant disposed of a hazardous substance at the Site. Therefore, when Mr. Smith's opinion rests on the assumption that a given defendant disposed of a hazardous substance at the Site, the opinion lacks an essential evidentiary foundation and is inadmissible.

Mr. Smith's conclusion that each defendant is a responsible party under CERCLA is premised upon Mr. Smith's assumption that each defendant disposed of a hazardous substance at the Site. Thus, Mr. Smith assumes one of the very facts that the defendants contend the plaintiffs cannot prove. As Mr. Smith opined [35]:

---

31. Smith Aff., ¶ 19.

32. Pltfs' Supp. Brief, p. 15.

33. *Id.,* p. 16.

34. *Id.,* p. 16.

35. Smith Aff., ¶ 19.

On the reasonable assumptions set forth in Paragraph 16, above, that at least a portion of each moving Defendants' waste containing hazardous substances came to the site, and in light of the analyses set forth in Paragraphs 17 and 18 above, my opinion is that each of the moving defendants contributed hazardous substances to the site....

The court agrees that "it is very easy to render an opinion concerning a fact if one assumes that fact to be true for purposes of the opinion. That is exactly what [Mr.] Smith has done in his Affidavit."[36] Mr. Smith states as facts the ultimate facts which the plaintiffs must prove to prevail. As in *Thomas v. FAG Bearings Corp.*, 846 F.Supp. at 1393–1394, Mr. Smith's opinions are premised upon assumed hypothetical facts.

 Furthermore, an expert's opinion "must be an 'expert' opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991) (citation omitted), *opinion amended by* 957 F.2d 301 (7th Cir.1992); *cf. Mid–State Fertilizer v. Exchange Nat'l Bank of Chicago*, 877 F.2d at 1340 (rejecting an economist's "expert" opinion that drew on inferences from the record rather than any economic expertise). To the extent that Mr. Smith's opinion draws exclusively on inferences from the record rather than expertise, Mr. Smith's opinion is inadmissible. Thus, Mr. Smith's opinion that each of the defendants contributed hazardous substances to the Site is inadmissible.

 Not all of Mr. Smith's opinions are inadmissible. As discussed, Mr. Smith made certain assumptions not within his expertise in reaching his opinions, and the defendants are correct that an expert may not assume a fact and then apply his expertise to the assumed fact to produce an opinion. In several instances, however, Mr. Smith did more than that. He based his opinions on his understanding of what various deposi-

tions reported, and he may do that under Rule 703. But an expert's opinion that is without foundation is worth nothing as evidence, and so is irrelevant for purposes of Rule 402 and not reliable for purposes of Rule 702 as construed in *Daubert.* In the instances in which the record provides no such foundation, Mr. Smith's opinion adds nothing to the question of whether a defendant disposed of hazardous wastes at the landfill.

Finally, as to whether each defendant's waste contained hazardous substances, Mr. Smith opines solely with respect to the hazardous constituents of a generic class or type of waste, e.g., flashlight batteries or paint, without limiting his opinion to the particular brands or products actually carried by the defendants.[37] Mr. Smith does not state that all classes or types of given products contain hazardous constituents.

 Mr. Smith does not state that the hazardous substances contained in the defendants' inert solid waste allegedly hauled to the Site, such as vinyl flooring or roofing materials, would be released under normal landfill conditions. If a chemical reaction is required to cause such waste, not otherwise listed as a hazardous substance, to generate a hazardous substance, then the plaintiffs must establish the likelihood of such a reaction. *See, e.g., B.F. Goodrich v. Murtha*, 840 F.Supp. 180 (D.Conn.1993) (mere presence of a hazardous substance in a constituent of a product does not render that product a hazardous substance); *United States v. New Castle County*, 769 F.Supp. 591 (D.Del.1991); *United States v. Serafini*, 750 F.Supp. 168 (M.D.Pa.1990) (concluding that an inert solid not itself a listed hazardous substance, but containing a hazardous substance, was not a hazardous substance).

#### b. The Tatum Affidavit

 The plaintiffs rely on John Tatum's affidavit to estimate the approximate volume of waste contributed by each defendant to

---

**36.** Reply of Syracuse Rubber, p. 9.

**37.** For example, Mr. Smith refers to "paint cans" and "paint wastes" in determining the constituents of these products. Mr. Smith does not iden-

tify the type of paint, and does not state that all known paints and paint wastes contain hazardous substances.

the Site from May 1974 through August 1978, compiled in a "waste-in" database.[38] Mr. Tatum relied on LDS records and deposition testimony in compiling his waste-in database. As the plaintiffs aptly remark, "Mr. Tatum's database simply confirms the eyewitness testimony of owners, drivers, and defendants themselves that some of each defendant's waste went to Lakeland."[39] Waste is not the same as hazardous waste, however, and Mr. Tatum does not offer any opinion that some of each defendant's hazardous waste went to Lakeland.

Mr. Tatum uses a "mass balancing" technique to determine that while David Lindsay operated LDS, 77% of the "solid waste" hauled by LDS was disposed of at the Site, and that while Mr. Shambaugh operated LDS, 36% of the solid waste was disposed of at the Site.[40] Mr. Tatum acknowledged that, apart from the tickets issued by LDS when it operated the Site as a county landfill, LDS kept no records of the specific loads disposed of at the Site.[41] Mr. Tatum then speculates that if 77% and 36% of the aggregate solid waste hauled during the respective eras was disposed of at the Site, then 77% and 36% of each defendant's waste was disposed of at the Site for the respective time period.

The defendants objected to Mr. Tatum's statement[42] that adjustments in his calculations were based on a defendant's distance from the Site and deposition testimony regarding LDS's practices. The defendants contend that Exhibit C to Mr. Tatum's affidavit does not support the allegation that such adjustments were made, and therefore, Mr. Tatum did no more than assume that a defendant's waste was disposed of at the Site.

The defendants are correct. Mr. Tatum calculated the volume of each defendant's waste hauled by LDS while Mr. Lindsay operated LDS and while Mr. Shambaugh operated LDS and simply multiplied those volumes by 77% and 36%, respectively. Mr. Tatum then added the two figures to obtain the approximate total volume of each defendant's waste disposed of at the Site. It appears that Mr. Tatum made no adjustments for distance, the form of each defendant's waste, or deposition testimony of LDS personnel. Mr. Tatum discounted the volume of waste hauled by LDS by the same factor regardless of the defendant's location. Mr. Tatum's calculation of approximate waste volume is often contrary to deposition testimony. For example, the 36% figure is not supported by the deposition testimony relied on by the plaintiffs establishing that 10% of Liberty's waste would have been disposed of at the Site.[43]

Mr. Tatum assumes that any LDS customer's waste had an equal probability of being in the last load of the day when the truck returned to the Site as being in the truck as it went from one route to another past the Site.[44] Mr. Tatum provides no factual basis for this assumption, and when viewed in the context of deposition testimony, the assumption is not well-founded. This assumption underlies Mr. Tatum's application of the mass balancing technique; thus, the lack of a factual basis for the assumption renders the application of the mass balancing technique highly questionable.

Mr. Tatum's mass balancing technique is based on conjecture and broad assumptions made without a supporting factual basis. That LDS may have disposed of 77% and 36% of all customer waste at the Site during the respective eras does not prove, nor create an inference, that LDS disposed of 77% and 36% of any defendant's waste. Moreover, Mr. Tatum fails to account for the increased number of LDS customers under Mr. Shambaugh's ownership.

For these reasons, the court agrees with the defendants that Mr. Tatum's opinion is

---

38. Tatum Aff., ¶ 12.

39. Pltfs' Supp. Brief, p. 19.

40. Tatum Aff., ¶ 10.

41. *Id.*, ¶ 9.

42. *See id.*, ¶ 11.

43. The court notes that no Liberty waste was disposed of at the Lakeland site during the time Mr. Lindsay operated LDS.

44. *See* Tatum Aff., ¶ 9.

insufficiently reliable to be admissible under *Daubert.*

## III. INDIVIDUAL DEFENDANTS

### A. American Standard, Inc.

 Peabody Modernfold, a division of American Standard, Inc. ("ASI"), was located in North Manchester, Indiana. John Rish, Peabody's plant manager from 1972 to 1980, was responsible for Peabody's waste handling practices and off-site disposal contracts. Peabody generated three types of waste: (1) liquid waste, which was disposed under contract with Enviro–Chem from Indianapolis; (2) scrap metal, which was sold to scrap metal companies; and (3) trash, consisting of solid waste generated by Peabody's business operations. Beginning around 1975, Peabody began using two waste hauling companies— LDS and Yogie Disposal Service ("Yogie")— to dispose of its trash. LDS and Yogie both provided compactor truck services; LDS provided all roll-off services. Mr. Rish stated that he did not know where LDS took the Peabody's roll-off trash or waste.[45]

ASI contends the plaintiffs cannot prove that ASI's former Peabody Division disposed of hazardous substances at the Site. ASI contends, first, that the uncontradicted testimony of LDS's owners and drivers is that they have no recollection of hauling any of Peabody's general trash in compactor trucks to the Site; and second, that the undisputed testimony of Paul Phillipy (the only driver who recalls hauling Peabody's trash to the Site) is that Peabody's roll-offs contained only wood and other large materials, but no cans, buckets, paint, liquids or sludges.

That ASI disposed of some type of waste at the Site is undisputed. ASI admits that LDS transported ASI's roll-off wastes, but denies that the roll-off wastes contained hazardous substances. Former LDS driver Paul Phillipy recalled that Peabody generally used one roll-off per week, and that he disposed of the roll-off wastes from Peabody at the Site.[46] According to Mr. Phillipy, the roll-offs contained the "bigger, larger stuff" and the "wood and stuff that was too large." Mr. Phillipy further testified that during the time period that he hauled roll-offs from Peabody, Peabody had daily compactor truck service.[47] No other LDS driver recalled hauling waste from Peabody to the Site.[48]

Former Peabody employee John Rish testified that Peabody's general production wastes generated throughout the plant included vinyl, oil and oil filters, brake fluid, transmission fluid, lacquer, used paint filters, five-gallon buckets containing solvent based paint, paint scrapings, adhesives, and alkaline cleaners.[49] The plaintiffs' expert, James Smith, established that such substances would contain such hazardous substances as BTEX compounds, PAHs, wear metals, plasticizers, and metal hydroxides, which were detected in the sampling of the Site.[50] Mr. Rish further testified that Peabody disposed of its general production wastes in its roll-off waste hauled by LDS;[51] but, as noted during oral argument, Mr. Rish also testified that Peabody used roll-offs for its general production wastes only for a few months during 1977 or 1978 when compactor truck services were unavailable.[52] Mr. Phillipy testified that compactor truck services were available throughout the time he hauled Peabody's roll-offs.[53]

Therefore, Mr. Rish's testimony that Peabody briefly used roll-offs for general production waste does not contradict Mr. Phillipy's testimony that Peabody's roll-offs contained the "bigger, larger stuff" and "wood

---

45. Rish Dep., at 46.

46. Phillipy Dep., at 76–80.

47. Phillipy Dep., at 77, 157–58.

48. The plaintiffs allege Robert Call stated that he hauled Peabody wastes and could not remember disposing the waste anywhere other than at the Site, but Mr. Call specifically stated that he could not remember where he hauled Peabody materials. Call Dep., at 18.

49. Rish Dep., at 30, 33–35, 53, 57, 67–69, 70–71, 73, 76–77, 81, 87, 94, 146.

50. Smith Aff., ¶ 21.

51. Rish Dep., at 28–29, 42–44.

52. *Id.,* at 28, 42.

53. Phillipy Dep., at 77, 157–58.

and stuff that was too large." The plaintiffs have not presented any evidence that any roll-off wastes containing hazardous substances were disposed of at the Site.

The plaintiffs contend that ASI omits two other services LDS provided to Peabody that would support a finding that Peabody wastes containing hazardous substances were disposed of at the Site. The plaintiffs first allege that in December 1974, LDS transported one load of waste from Peabody containing at least 1,743 full aerosol spray paint cans. In support of this allegation, the plaintiffs rely on the testimony of former LDS owner David Lindsay, a Peabody shipping order, and Mr. Rish's testimony. Mr. Lindsay testified, based on an LDS invoice, that the aerosol spray paint cans were "hauled to my landfill." [54] Mr. Lindsay added, however, "there is a possibility that it [the aerosol spray paint cans] could have got to the one ... in Syracuse," [55] and that he could not tell where the aerosol cans were hauled based on the invoice. [56] Mr. Lindsay could not testify for certain whether the aerosol cans were taken to the Site.

The plaintiffs also rely on a Peabody shipping order, allegedly documenting the transaction indicating a delivery address of "Claypool Indiana", where the landfill was located. [57] But, as ASI points out, the shipping order lists no disposal site. Mr. Lindsay testified that the reference on Peabody's shipping order to "Claypool, Indiana" as the delivery address would not require LDS to haul the aerosol cans to the Site.

Mr. Rish testified that the aerosol cans were disposed of at a landfill for which Steve Shambaugh had state approved licensing. [58] When the aerosol cans were hauled in 1974, Mr. Shambaugh was not affiliated with LDS or the Site; rather, he operated another waste hauling company, Dunn & Shambaugh, and was not affiliated with LDS or Lakeland

until 1976. Mr. Rish did not know where the particular landfill affiliated with Mr. Shambaugh was located. [59] He knew only that the landfill was located north of Peabody. [60] Mr. Rish believed that the landfill was the "Four Square" landfill, [61] or the "Four Counties" landfill in Fulton County. [62]

The plaintiffs also allege that LDS provided Peabody with packer truck service from July 1976 until the Site closed in September 1978, which was during the time Mr. Shambaugh owned LDS. Mr. Lindsay's testimony that compactor trucks servicing North Manchester would use the Site, as relied on by the plaintiffs, is irrelevant to this issue; Peabody did not use LDS for compactor truck service while Mr. Lindsay owned and operated LDS. Mr. Phillipy testified that all compactor truck waste from Peabody was disposed at Spring Valley. [63] Although Mr. Phillipy testified that waste from Manchester went to Lakeland when a compactor truck was serviced, he could not say that when a compactor truck carrying waste from Manchester went to Lakeland it was carrying waste from Peabody. Thus, the plaintiffs have presented no evidence that even one compactor truck serviced at the Site contained Peabody waste.

The plaintiffs have not come forward with material facts establishing a genuine issue for trial with respect to the aerosol spray paint cans, compactor truck services, or roll-off wastes. Therefore, the plaintiffs have failed to present evidence sufficient to withstand ASI's motion for summary judgment on the issue of whether ASI is liable as a CERCLA generator who disposed of hazardous substances at the Site.

Accordingly, ASI's motion for summary judgment should be granted.

54. Lindsay Dep., at 420.

55. *Id.*, at 420.

56. Lindsay Dep., at 421.

57. *See* Document No. AS000001.

58. Rish Dep., at 101–105.

59. Rish Dep., at 105.

60. *Id.*, at 111.

61. Rish Dep., at 105.

62. Rish Dep., at 111.

63. Phillipy Dep., at 81.

## B. City of Warsaw

■ The City of Warsaw, Indiana ("Warsaw"), was a generator of municipal solid waste ("MSW") and sewage digester sludge, produced by the publicly-owned sewage treatment works. LDS once hauled about 600,000 gallons of Warsaw's sewage sludge from the sewage plant. The plaintiffs do not dispute that the sewage sludge was spread on farm fields rather than being taken to the Site.

Warsaw's municipal solid waste generally was taken to the Ransbottom Landfill in Packerton, Indiana, but Warsaw disposed of twenty loads of municipal solid waste at the Site between March 10, and 19, 1975. Former LDS driver Robert Call testified that he hauled waste for Warsaw and disposed of the waste at the Site and at Packerton.[64] Mr. Call remembered that the trash he hauled was "[b]asically miscellaneous trash."[65] Posey Lester testified that Warsaw's waste was deposited at the Site.[66] Mr. Lester could not remember how long Warsaw dumped waste at the Site.[67]

Warsaw contends that the determinative issue is whether the plaintiffs have presented any evidence that its municipal solid waste deposited at the Site contained any specifically identified hazardous substances. The plaintiffs contend that the evidence shows that Warsaw's waste contained hazardous substances. Even assuming this as true, the plaintiffs cannot prevail. The plaintiffs have presented absolutely no evidence to establish that any of Warsaw's waste that was hauled to the Site during the ten day period in March 1975 actually contained hazardous substances. The plaintiffs established no more than a metaphysical possibility that Warsaw's waste disposed of at the Site contained hazardous substances.

The plaintiffs rely on the testimony of former LDS and Warsaw employees that Warsaw's waste contained wastes generated by commercial enterprises and residences.[68] The plaintiffs are correct that Pat Ragan, supervisor of Warsaw's waste disposal during the relevant time period, stated that small batteries or flashlight batteries "would have been considered I think inconsequential" and have gone to the Site.[69] Mr. Ragan stated that oil filters were not picked out of the general trash, but that if someone saw an oil can in the trash, they would pick it out.[70] Waste Management picked up Warsaw's waste oil.[71] Mr. Ragan's testimony is nothing more than speculation as to what Warsaw's waste might have contained. The plaintiffs have come forward with no evidence that any batteries or oil filters were contained in any of the trash disposed of at the Site.

Contrary to the plaintiffs' contention,[72] Mr. Ragan did not admit that residential paint waste would pass unnoticed in the trash. Rather, Mr. Ragan testified that Warsaw had a special truck pickup for paint cans and that the truck disposed of the cans at the Ransbottom Landfill.[73] When asked whether he recalled that paints and paint cans were in the general trash, Mr. Ragan responded, "I don't remember. I am sure that if somebody was painting a room in their house and had a half a gallon left, it would hit the trash. We wouldn't know that."[74] Similarly, Mr. Ragan testified that if somebody put a car battery in the general trash, Warsaw would not know.[75]

64. Call Dep., at 78–79.

65. *Id.*, at 79.

66. Lester Dep., at 123.

67. *Id.*, at 89.

68. The plaintiffs rely in part on the testimony of Dale Tucker, the city's mayor from 1976 through 1979. Because it is undisputed that Warsaw waste was disposed of at the Lakeland site only during a ten-day period in 1975, Mr. Tucker's testimony simply is not relevant.

69. Ragan Dep., at 36.

70. *Id.*, at 36–37.

71. *Id.*, at 39.

72. *See* Brief in Opposition, p. 43 (citing Ragan Dep., at 33–35).

73. Ragan Dep., at 33–34.

74. Ragan Dep., at 34.

75. Ragan Dep., at 34–35.

Mr. Ragan also testified that five gallon paint thinner cans, five gallon paint buckets, and used paint brushes utilized by Warsaw were discarded in the trash and would go to "the landfill",[76] but he did not state that such cans, buckets, or brushes would go to the "Lakeland landfill". Again, this aspect of Mr. Ragan's testimony is mere speculation and does not prove that any paint or paint cans were in the Warsaw trash disposed at the Site.

The court finds persuasive the approach taken in *B.F. Goodrich Co. v. Murtha*, 840 F.Supp. 180 (D.Conn.1993) (holding municipal solid waste generators not liable for disposal of materials that were not CERCLA hazardous substances but contained elements which were CERCLA hazardous substances). The municipal generator defendants in *Murtha* conceded that municipal solid waste may include materials containing hazardous substances, but the court found that there was no direct evidence that any of the defendant's MSW deposited at the site contained a hazardous substance. 840 F.Supp. at 187. The plaintiffs relied on an expert's affidavit stating that as a general rule, municipal solid waste contains hazardous substances. 840 F.Supp. at 187–88. The court determined that the expert affidavit was insufficient to permit an inference that any of the municipal generator defendants disposed of a hazardous substance at the site. 840 F.Supp. at 188.

Similarly, Mr. Smith's affidavit, proffered by the plaintiffs to establish that Warsaw disposed of wastes containing hazardous substances, is insufficient evidence on the critical issue. As in *B.F. Goodrich v. Murtha*, 840 F.Supp. at 189, Mr. Smith reaches his expert opinion by assuming unsupported facts. He assumes that the Warsaw waste hauled to the Site included flashlight batteries, used oil filters, paint, paint cans, paint brushes, waste motor oil, and other waste generated from service on city vehicles.[77]

Because the plaintiffs have not established that any of the twenty loads of Warsaw waste hauled to the Site contained any of those items, Mr. Smith's assumption is inadmissible in light of Fed.R.Evid. 703. The plaintiffs cannot use Mr. Smith's affidavit to prove the very fact—that Warsaw's waste hauled to the Site contained hazardous substances—that Mr. Smith assumes to be true.

In summary, Warsaw's municipal solid waste was taken to the landfill about twenty times during a ten-day period in March 1975. This is far from the predictable and relatively consistent waste stream that has been held to be sufficient to survive summary judgment in other cases. Accordingly, to survive summary judgment the plaintiffs must show something more about the waste actually hauled to the Site. The record before the court contains nothing more than what may be described as basically "anything's possible" testimony, which would not suffice to allow a reasonable trier to find that it is more likely than not that Warsaw deposited hazardous waste in the landfill.

Accordingly, the City of Warsaw is entitled to summary judgment.

### C. Dalton Foundries, Inc.

Dalton Foundries, Inc. ("Dalton") operates a gray iron foundry in Warsaw, Indiana. Dalton makes iron castings by melting scrap metals, pig iron, and coke. Molten iron is poured into sand molds also made at the foundry. Dalton also makes the sand core molds for the cavity of the finished product.[78]

Between 1974 and 1978, Dalton used two types of "wet scrubber" air emission control systems to control air pollution.[79] The "venturi scrubber" was an air pollution control device found in the cupola (melting apparatus) that precipitated airborne particulates discharged during the cupola melting process.[80] The venturi scrubber was used only in the cupola.[81] Dalton's melting process generated a non-metallic residue known as

---

76. Ragan Dep., at 40–42.

77. Smith Aff., ¶¶ 16, 23.

78. Rawlings Dep., at 16–26, 46.

79. Canan Aff., ¶ 3; Corbett Aff., ¶ 3; Corbett Dep., at 65.

80. Rawlings Dep., at 29–30, 146–147, 170–171.

81. *Id.*, at 29–30.

"slag",[82] which was cooled in a slag tank and disposed of by Ruse Construction, which Bob Barsh owned and operated from 1974 through 1978.[83]

The other wet scrubber air control device Dalton used was the "Schneible wet dust collector" that removed dust from the plant's air.[84] The Schneible wet dust collectors, located in and around the sand systems in the shake house, including the molding and mold cooling rooms,[85] generated a watery sludge (sometimes referred to as "slurry").[86] This sludge was collected in a tank beneath the dust collector stacks, which was separate from the venturi and slag tank.[87] Ruse Construction usually hauled the slurry from drying beds,[88] but the slurry occasionally would be pumped directly from the Schneible tanks.[89]

LDS hauled three types of Dalton waste: (1) slurry from Dalton's Schneible dust collector tanks between 1974 and late 1975; (2) thirty to forty mostly empty drums hauled on one occasion; and (3) general industrial trash in roll-offs between late 1974 and August 1978. Posey Lester testified that he once hauled thirty to forty mostly "empty" drums from Dalton to the Site; Mr. Lester did not know what was in the drums.[90] The roll-off waste included broken pallets, cardboard, and office trash, and occasionally contained used filters, batteries, and empty containers of "typical household cleaners."

Mr. Shambaugh believes that the Packerton Landfill was the landfill nearest Dalton.[91] During the Shambaugh era, the majority of waste hauled from customers located from north Warsaw to the south went to Packerton.[92] The plaintiffs have not challenged Dalton's assertion that it is and was located south of Warsaw.

There is no evidence that Dalton was included among the waste generators reflected in the "Kosciusko County" landfill receipts used by the Site when it was open to the general public from January through March 1975. Dalton is not included on the January 1976 through August 1978 SPC–17 liquid waste hauler reports, consistent with Mr. Shambaugh's testimony that LDS did not haul sludge for Dalton during the Shambaugh era.[93] Some landfill receipts from the Custer Landfill indicate Dalton's waste was hauled there.[94]

Dalton contends summary judgment is appropriate because the plaintiffs have insufficient evidence to support a finding that Dalton disposed of hazardous substances at the Site.

### 1. Schneible dust slurry

■ No one disputes that LDS hauled Dalton's Schneible dust collector slurry to the Site on occasion in 1974 and 1975 during the Lindsay era,[95] but the parties dispute whether the slurry was hazardous. In June

---

**82.** *Id.*, at 26.

**83.** Canan Aff., ¶ 5; Corbett Aff., ¶ 5; Barsh Aff., ¶ 6; Grimm Aff., ¶ 4; Rawlings Dep., at 41, 177, 197.

**84.** Corbett Dep., at 51–52, 65; Rawlings Dep., at 69–70, 79–82; Corbett Aff., ¶ 3; Canan Aff., ¶ 3.

**85.** *See* Corbett Dep., at 51–52, 65; Rawlings Dep., at 69–70, 79–82.

**86.** Rawlings Dep., at 49–50.

**87.** *Id.*, at 49–50.

**88.** *Id.*, at 41, 177, 197; Corbett Dep., at 14–15, 53.

**89.** Rawlings Dep., at 185–186; Canan Aff., ¶ 2; Corbett Aff., ¶ 2.

**90.** Lester Dep., at 90–92, 95–96, 110–111, 179–180, 183–184.

**91.** Shambaugh Dep., at 378, 706.

**92.** Shambaugh Dep., at 387; Lester Dep., at 87–89; Tillman Dep., at 35–36, 55–57, 60, 66, 68, 70, 72, 81, 91, 94, 98, 166, 168 (60%–70% went to Packerton); Conley Dep., at 116–117 ("probably fifty percent" to landfills other than the Site).

**93.** Shambaugh Dep., at 103–104.

**94.** Conley Dep., at 56–66.

**95.** David Lindsay testified that on rare occasions he pumped "watery" slurry from Dalton and that he spread the slurry at the Site. Lindsay Dep., at 60–61, 72, 151–52, 185–87, 310–11, 424–25. A September 1975 Dalton purchase order confirmed that LDS was to pump from the "Scaneble Collector", which was the Schneible collector.

1976, the State Board of Health performed the only known test conducted on the Schneible dust collector slurry between 1974 and 1978. The Board of Health concluded that the material was about half water and had "no heavy metals present—no phenols" and only a "small amount of oil."[96]

Petroleum, "including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance", is specifically excluded from the definition of CERCLA hazardous substances. 42 U.S.C. § 9601(14); *see also City of New York v. Exxon Corp.*, 766 F.Supp. 177, 185–89 (S.D.N.Y.1991). The plaintiffs have presented no evidence that the oil in the Schneible slurry was contaminated with a waste oil such that it would not fall within the CERCLA petroleum exclusion.

■ The plaintiffs attempt to show that Dalton's Schneible slurry contained various types of waste containing hazardous substances. They contend that "the particulate collected included molding sand, parting [or release] agents and binding agents,"[97] and that the molding sand contained "metal residue and phenols".[98] The evidence in the record before the court, however, does not support an inference that the Schneible slurry hauled by LDS in 1975 contained hazardous substances.

Dalton's operations changed with respect to the Schneible wet dust collector system after 1976—after the Lindsay era. In early May 1979, Dalton installed a pump between the venturi system and Schneible wet dust collector system which introduced heavy metals from the venturi system into the Schneible system.[99] That first pump was then replaced by another mechanism that also introduced heavy metals into the Schneible system.[100] Dalton also expanded the capacity of its core room manufacturing processes in 1976, causing an increase in Dalton's use of phenolic agents.[101]

The post–1979 Micon laboratory test results,[102] upon which the plaintiffs rely, would reflect these changes in the composition of Dalton's wet dust collector wastes. The plaintiffs have offered no evidence to establish that Dalton's waste stream in 1975 would have obtained the same or similar laboratory test results. Likewise, the May 5, 1983 correspondence from Mr. Rawlings to David Koepper of the Indiana State Board of Health,[103] does not indicate that Dalton's core sands from the wet dust collector system contained hazardous substances in 1975. The plaintiffs have offered no evidence that contaminates listed in the 1983 correspondence would have been contained in Dalton's core sands in 1975 when LDS hauled the Schneible slurry. The plaintiffs have not established the relevance of these post–1979 test results with respect to the constituents of Dalton's 1975 wet dust collector waste.

The plaintiffs also rely on correspondence from Robert Rawlings, dated April 22, 1980, that identifies alleged hazardous substances that "may" be found on foundry sands.[104] The correspondence indicates that the list came from the manufacturer's data sheets. The correspondence does not indicate which,

**96.** App. A to Dalton's Memorandum in Support of its Mot. for Sum. Judg., Exh. F.; Dalton's Supp. Resp. to Discovery Requests, Addendum A.

**97.** *See* Brief in Opposition, p. 50 (citing Rawlings Dep., at 56–58, 78–82; Document Nos. I00836–I00842). Dalton seeks to strike these documents from the record, pursuant to the court's December 4, 1994 Order on Discovery, ¶ E(4), on the grounds that the plaintiffs failed to disclose these documents in their mandatory prediscovery disclosures or supplements thereto, despite the fact that the documents were within their possession. This remedy is warranted by Fed.R.Civ.P. 37(c)(1), but is unnecessary in this case.

**98.** *See* Brief in Opposition, p. 50 (citing Rawlings Dep., at 78–82; Document No. I00837–I00842; Corbett Dep., at 56–57).

**99.** Wear Aff., ¶¶ 3, 4, 6.

**100.** Wear Aff., ¶¶ 5, 6.

**101.** *Id.*, ¶¶ 7, 9.

**102.** *See* Document Nos. I00837–I00839. The Micon report is dated January 20, 1981. Document No. I00839, Brief in Opposition, Exh. 7, Tab B(1).

**103.** *See* Brief in Opposition, Exh. 7, Tab (B)(1), Document Nos. I00839–I00842.

**104.** Document No. I00836.

if any, of the allegedly hazardous substances actually would be found in the foundry sands. Moreover, as discussed previously, the plaintiffs have provided no basis for inferring that Dalton's 1975 wet dust collector waste was the same as Dalton's post–1979 wet dust collector waste. Thus, the correspondence is insufficient to establish that such allegedly hazardous substances were, in fact, in the foundry sands.[105]

The plaintiffs rely on Robert Rawlings' testimony in an effort to show that the wet dust collector waste contained hazardous substances. First, the plaintiffs rely on Mr. Rawlings' testimony to establish that particulate from the wet dust collectors contained parting agents and binding agents. Mr. Rawlings also testified, however, that the binding and release agents used in the shell and core making processes would have either burned off or evaporated during the core making process.[106] Mr. Rawlings specifically testified that the shell core process did not generate particulate.[107]

Second, the plaintiffs rely on Mr. Rawlings' testimony to establish that the molding sand contained phenols, but Mr. Rawlings merely speculated that the wet dust collector would generate sand particles.[108] Third, the plaintiffs rely on Mr. Rawlings' testimony to establish that the molding sand contained metal residues, even though Mr. Rawlings testified that it would be unlikely that heavy metals would have been collected in the wet dust collectors since the heat velocity was not sufficient to drive them into the air.[109] Mr. Rawlings further testified that he would expect that laboratory tests would indicate whether the dust collected by the wet dust collector contained heavy metals.[110] No heavy metals were present in the 1976 laboratory tests.

Finally, contrary to the plaintiffs' assertion,[111] metal particulates and dust from the grinding operations were collected by the dry bag house filter system rather than the wet dust collector.[112] Non-airborne particulates from the grinders were remelted.[113]

The plaintiffs have not presented evidence that could support a finding that it is more likely than not that Dalton's Schneible slurry, hauled by LDS in 1974 and/or 1975, included any material containing hazardous substances.

### 2. Venturi sludge

Although the evidence shows that Schneible dust slurry was pumped on occasion, no evidence suggests that the venturi sludge would have been pumped.[114] Mr. Lindsay testified that the only way LDS hauled Dalton's slurry was with the pumper wagon.[115] Robert Call testified that he pumped two or three loads of some material from Dalton, which he then hauled to the

---

105. Because this correspondence is not probative as to the contents of Dalton's wet dust collector waste in 1974 and/or 1975, the court need not consider Mr. Smith's opinion that these materials contained hazardous substances. Smith Aff., ¶ 26(B).

106. Rawlings Dep., at 159–160 ("binding agents have to break down under heat"), 163–164 (sand core would not have any releasing agents).

107. Rawlings Dep., at 59.

108. Id., at 81 ("Again, I would theorize it [the particulate collected in the cooling area] probably would be the products of combustion from the binders.... It's possible I suppose there would be some fine sand particles, although I would think that would be minimum.").

109. Rawlings Dep., at 171–172.

110. Id., at 169.

111. See Brief in Opposition, p. 50.

112. Rawlings Dep., at 83–85, 86, 171–172.

113. Rawlings Dep., at 87–88.

114. The plaintiffs cite to the deposition testimony of Mr. Lindsay and Mr. Rawlings, as well as certain documents, to support their allegation that Mr. Lindsay hauled sludges from the venturi scrubber to the Site. None of the pages cited by the plaintiffs support their allegation. Mr. Lindsay had no knowledge of where the sludge was generated; Mr. Rawlings did not mention LDS or the Site in the part of his testimony cited. Document Nos. DF000020–DF000022, cited by the plaintiffs, are LDS's invoices that merely reflect LDS hauled loads of sludge for Dalton; the documents do not indicate the kind of sludge or where the sludge was generated.

115. Lindsay Dep., at 185.

Site.[116] John Canan, Dalton's Vice President of Engineering from 1974 through 1978, and Jim Corbett, Dalton's Director of Engineering from 1974 through 1978, both recall that LDS pumped Schneible dust collector slurry on an experimental basis.[117] Bob Rawlings, who was responsible for Dalton's manufacturing operations during the relevant time period, testified that pumping would have been an alternative means of removing the slurry from the Schneible dust collector if the drag chain malfunctioned.

Neither Mr. Canan, Mr. Corbett, nor Mr. Rawlings believes that the venturi sludge was pumped.[118] Mr. Canan and Mr. Corbett both stated that venturi sludge would have been "too thick to be pumped." [119] Mr. Rawlings testified there would be no reason to pump the venturi sludge from the tank because it could be drained through a valve.[120]

In support of their allegation that LDS hauled venturi sludge to the Site, the plaintiffs claim that the Schneible collectors were not installed until late 1975, but the plaintiffs have misread Dalton's Supplemental Discovery Response as stating that no Schneible wet dust collector air control system was in operation prior to late 1975.[121] Thus, the plaintiffs deduce that any sludge taken from Dalton's pollution control system must have been from the venturi scrubber. Dalton's supplemental response merely stated that Dalton had installed a "No. 4 Schneible dust collector system" in 1975 [122]; nothing in Dalton's supplemental discovery response suggests that the No. 4 Schneible system was the first or only such system installed at Dalton. To the contrary, Dalton's response further states that other wet scrubber systems were in place during the 1974–1976 period. Mr. Corbett and Mr. Canan also stated that Dalton had two wet scrubber air emission control systems, including the Schneible dust collector, in place during the entire period of time of 1974 through 1978.[123]

The plaintiffs further seek to show that LDS hauled venturi sludge based on the allegedly different colors of the venturi sludge and Schneible slurry. The plaintiffs contend the testimony shows that venturi sludge was much blacker than the Schneible slurry. Mr. Lindsay testified that the sludge that he pumped was dirty and black and necessitated a great deal of washing to remove.[124] The plaintiffs then claim, relying solely on Dalton's supplemental discovery responses, that the Schneible slurry would have been "sandy" in appearance.[125]

Dalton's supplemental discovery response upon which the plaintiffs rely related to the texture of the Schneible sludge rather than to the color.[126] The evidence shows that the Schneible slurry was a black color—Mr. Rawlings testified that the Schneible slurry was a "gritty black" substance similar in color to the venturi sludge.[127] Indeed, the Schneible slurry may have been darker in color than the venturi sludge.[128]

The plaintiffs attempt to distinguish the sludge hauled by Mr. Lindsay in 1974 from

---

**116.** Call Dep., at 46–51, 110.

**117.** · Canan Aff., ¶ 11, Corbett Aff., ¶ 11; Corbett Dep., at 10–13.

**118.** Canan Aff., ¶ 10; Corbett Aff., ¶ 10; Rawlings Dep., at 185–186.

**119.** Canan Aff., ¶ 4; Corbett Aff., ¶ 4.

**120.** Rawlings Dep., at 185–186.

**121.** Brief in Opposition, p. 46 (citing Dalton's Supp. Discovery Resp. No. 1(j)); *see also* App. A. to Dalton's Mem. in Supp. of its Mot. for Sum. Judg., Exh. F.

**122.** Dalton's Supp. Discovery Resp. No. 1(j)); *see also* App. A. to Dalton's Mem. in Supp. of its Mot. for Sum. Judg., Exh. F.

**123.** Corbett Aff., ¶ 3; Canan Aff., ¶ 3.

**124.** Lindsay Dep., at 59–61.

**125.** Brief in Opposition, pp. 46–47 (citing Dalton's Supp. Discovery Resp. No. 1(j)); *see also* App. A. to Dalton's Mem. in Supp. of its Mot. for Sum. Judg., Exh. F.

**126.** Dalton's Supp. Discovery Resp. No. 1(j)); *see also* App. A. to Dalton's Mem. in Supp. of its Mot. for Sum. Judg., Exh. F.

**127.** Rawlings Dep., at 72.

**128.** *Id.,* at 40, 73, 153, 167–168.

the Schneible slurry hauled by Robert Call, who testified that he pumped "reddish-brown" sludges from Dalton in 1975.[129] It is undisputed that the sludge that Mr. Call pumped in 1975 would have been Schneible slurry.[130] The plaintiffs claim that Mr. Call's description of the Schneible slurry differs from Mr. Lindsay's description of the sludge, and therefore, they assert that the sludge hauled by Mr. Lindsay must have been a different type of sludge than that hauled by Mr. Call. Hence, the plaintiffs contend that because the sludge Mr. Call hauled was Schneible slurry, Mr. Lindsay's sludge of a different color must have been venturi sludge.

Importantly, there is no evidence that Mr. Call actually compared the sludge he hauled to the sludge hauled by Mr. Lindsay. The plaintiffs have not established that Mr. Call would have described the sludge hauled by Mr. Lindsay differently—that is, there is no evidence that Mr. Call would not have described that sludge as "reddish brown" as well. Thus, Mr. Call's testimony is not necessarily inconsistent with the other evidence that Mr. Call hauled the same material that Mr. Lindsay pumped,[131] and that neither the venturi sludge nor the Schneible slurry, at least in Mr. Rawlings' opinion, was "reddish brown".[132]

The plaintiffs' efforts to distinguish the sludge hauled by Mr. Lindsay from that hauled by Mr. Call are too speculative to warrant a reasonable inference that the sludge hauled by Mr. Lindsay in 1974 was venturi sludge rather than Schneible slurry.

### 3. 30 to 40 Empty Drums

The plaintiffs have not presented any admissible evidence that Dalton's drums contained hazardous substances.[133] Posey Lester, the only LDS driver to testify that he hauled drums from Dalton to the Site,[134] did not know what was in the thirty to forty drums which he hauled to the Site. Mere disposal of drums at the Site is not sufficient to establish liability under CERCLA. *See, B.F. Goodrich v. Murtha,* 840 F.Supp. 180; *United States v. Wade,* 577 F.Supp. 1326, 1341–42 (E.D.Pa.1983) (holding "mere placement of drums at the site will not suffice to establish [liability]," in the absence of such information as their contents, number, and frequency of disposal). Therefore, Dalton is entitled to summary judgment with respect to the alleged disposal of drummed waste.

### 4. Roll-off Waste

Most of Dalton's roll-off waste went to other landfills, particularly Ransbottom. One LDS driver, Tony Tuell, was primarily responsible for hauling roll-off waste from Dalton.[135] Mr. Tuell has not been located or

---

129. Call Dep., at 46–52, 126–127.

130. Brief in Opposition, p. 47.

131. Call Dep., at 46–51, 110.

132. Rawlings Dep., at 167–168.

133. The plaintiffs attempt to establish that the drums contained hazardous substances because the drums contained "waste which Dalton had previously disposed of by road oiling." Brief in Opposition, p. 51 (citing Lester Dep., at 95–97). But the testimony upon which the plaintiffs rely is inadmissible hearsay. Posey Lester testified that when he was picking up the drums, "this guy was walking across the [Dalton] grounds—I don't know if he's an employee or what he was." Lester Dep., at 95–96. According to Mr. Lester, "this guy" told him, "we [Dalton] used to dump it out here just to keep the dust down and they told us we couldn't do that no more." Lester Dep., at 95–96. The plaintiffs offer Mr. Lester's testimony to prove the truth of the matter asserted—that Dalton used to dump the drums to keep the dust down, which the plaintiffs infer to be "road oiling". The testimony of this unknown man with an unknown source of knowledge is, when offered to prove the truth of the matters asserted, inadmissible hearsay. *See* Fed.R.Evid. 801(c); *Amcast Industrial Corp. v. Detrex Corp.,* 779 F.Supp. 1519, 1528 (N.D.Ind.1991), *aff'd in part, rev'd in part on other grounds,* 2 F.3d 746 (7th Cir.1993), *and cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994).

134. The plaintiffs claim that Don Conley, another LDS driver, testified that Dalton's roll-off waste contained loose drums. Brief in Opposition, p. 48 (citing Conley Dep., at 18–19, 120). Mr. Conley did not so testify. Rather, Mr. Conley speculated that "[i]f there were any barrels, it was in the regular trash roll-off containers.... It might even have been empty barrels." Conley Dep., at 18. Mr. Conley did not testify that he picked up any barrels.

135. Conley Dep., at 18–19, 131–132.

deposed. Posey Lester, who occasionally hauled Dalton's roll-off waste in place of Mr. Tuell,[136] testified that he hauled Dalton's roll-off waste to both Ransbottom and the Site.[137] Mr. Lester went to the Site only during the Shambaugh era, but, even then, he hauled most of Dalton's roll-off waste to Ransbottom.[138] Paul Phillipy also hauled Dalton roll-off waste to both Ransbottom and the Site.[139] Don Conley stated that he may have hauled one or two Dalton roll-offs [140]; half the loads Mr. Conley hauled for LDS went to other landfills.[141] Robert Call also hauled Dalton roll-offs—half went to Ransbottom and half went to the Site.[142] Alan Regenos hauled Dalton roll-offs to the Site.[143] No documents or records indicate that any particular load of roll-off waste was taken from Dalton to the Site.

The plaintiffs misinterpret the record regarding Dalton's waste hauled by LDS. The plaintiffs contend that Dalton's waste contained foundry sand, metal grindings, broken cores, oils, and other wastes.[144] Contrary to the plaintiffs' assertion,[145] foundry sand that was used for floor sweeping was not disposed of in the waste hauled by LDS. Mr. Warren testified that the foundry sand "was generally put in hoppers and taken outside with the scrap sand or broken cores." [146] Mr. Warren also testified that, to his knowledge, the foundry sand was not disposed of in the LDS hoppers.[147] Mr. Warren merely speculated

that it was "possible" that foundry sand could have been placed in the LDS hoppers.[148]

The record shows that plant floor sweepings were disposed of in "tilt" hoppers, which were dumped into a concrete bunker and later hauled by Ruse Construction.[149] Thus, if the plant floor sweepings contained foundry sand, the foundry sand would have been disposed in the concrete bunker.[150]

Mr. Regenos testified that "floor sweepings" were contained in the Dalton roll-offs that he hauled,[151] but this testimony is consistent with Mr. Warren's testimony that Dalton had janitors who swept the office floor and disposed of the office floor sweepings in the containers hauled by LDS.[152] Nothing in the record establishes that the floor sweepings observed by Mr. Regenos were "plant" floor sweepings from the manufacturing area rather than general office floor sweepings. The evidence is unchallenged that only office floor sweepings, not plant floor sweepings, were hauled by LDS to the Site.[153] The plaintiffs have presented no evidence from which a factfinder could find that Dalton office floor sweepings contained hazardous substances.

The foundry sand collected in bag house filters contained particulates from the grinding area. These bag house filters were disposed of in the roll-offs hauled by LDS, but Dalton changed and disposed of the bag

**136.** *Id.,* at 131.

**137.** Lester Dep., at 87.

**138.** *Id.,* at 87.

**139.** Phillipy Dep., at 163–165, 171, 234–235; Phillipy Aff., ¶¶ 6, 7.

**140.** Conley Dep., at 19.

**141.** Conley Dep., at 116.

**142.** Call Dep., at 53.

**143.** Regenos Dep., at 15–16, 27–28, 116–117.

**144.** Brief in Opposition, pp. 51–53.

**145.** See Brief in Opposition, p. 52 (citing Warren Dep., at 16–23; Regenos Dep., at 117). Randy

Warren was a maintenance supervisor at Dalton in 1974 and the general supervisor until 1980.

**146.** Warren Dep., at 17.

**147.** *Id.*

**148.** Warren Dep., at 17.

**149.** Warren Dep., at 11–16; Rawlings Dep., at 114–115; Bice Dep., at 30–31. Don Bice was Mr. Warren's supervisor; Mr. Bice was employed at Dalton from 1969 until 1980.

**150.** The same is true for any oil spilled on the plant floor and swept up with the foundry sand or floor dry. *See* Brief in Opposition, p. 53.

**151.** Regenos Dep., at 117.

**152.** Warren Dep., at 11–14.

**153.** *Id.,* at 15; Bice Dep., at 30–31.

house filters only once each year.[154] Given this infrequent disposal, the plaintiffs cannot prove by a preponderance of the evidence that the bag house filters were hauled to the Site rather than to another area landfill.

The plaintiffs strive to show that LDS hauled broken cores to the Site.[155] The plaintiffs rely on the deposition testimony of three LDS drivers, Mr. Phillipy, Mr. Call, and Mr. Tillman, but none of these drivers testified that they hauled broken cores to the Site. It seems that Mr. Phillipy confused "broken molds" with the dust and grindings he expected to encounter in any roll-off container.[156] Mr. Call never referred to broken molds in the portion of his deposition cited by the plaintiffs.[157] Likewise, Mr. Tillman never referred to broken molds; he described a powder or dust in the roll-off waste.[158]

Dalton does not dispute that used oil filters occasionally were disposed of in the roll-off waste, but, like the bag house filters, the plaintiffs have presented no evidence to show that the used oil filters more likely than not were disposed of at the Site rather than another landfill. In any event, the plaintiffs have not carried their burden of proving by a preponderance of the evidence that the used oil filters contained hazardous substances.

The plaintiffs contend that paint, used paint brushes, paint thinners, and paint buckets were disposed of in the roll-off waste hauled by LDS, but have not come forth with sufficient evidence to support this contention. First, the plaintiffs erroneously claim that Mr. Warren testified regarding "paint thinners". Mr. Warren's testimony was that he recalled seeing "empty cans of paint thinner" in the containers to be hauled by LDS;[159] empty cans do not contain hazardous sub-

stances. Second, Mr. Bice and Mr. Fraley did not testify that paint brushes or paint cans were disposed of in containers hauled by LDS.[160] Rather, Mr. Bice testified that he did not recall how the paint buckets were discarded,[161] and Mr. Regenos merely speculated that "maybe an old paint bucket" was contained in the roll-offs.[162] Thus, the plaintiffs have not come forth with evidence to support an inference that such materials were disposed of in the roll-off containers hauled by LDS.

The plaintiffs' contention that LDS hauled rust-proofing paints and solvents is not supported by the evidence (nor by the testimony cited by the plaintiffs). Neither Mr. Fraley, Mr. Corbett, nor Mr. Rawlings testified that rust-proofing paints were disposed of in containers hauled by LDS.[163] Neither Mr. Rawlings, Mr. Fraley, nor Mr. Warren testified that any solvents were disposed of in waste hauled by LDS. Mr. Fraley merely testified that Dalton purchased trichloroethylene and kerosene.[164] Mr. Rawlings testified that solvents dripped onto the floor, were swept up, and disposed in the concrete pits.[165] Those concrete pits were disposed of by Ruse Construction.[166] The plaintiffs have not established that LDS hauled rust-proofing paint and solvents.

Even assuming an occasional Dalton roll-off contained hazardous substances from used oil filters, batteries, dry bag house filters, and empty containers of household type cleaners, the plaintiffs cannot establish that particular roll-off more likely than not went to the Site rather than to another area landfill. At best, Dalton waste was disposed of at the Site half of the time. This is not the consistent and predictable waste stream that

**154.** Warren Dep., at 32.

**155.** *See* Brief in Opposition, pp. 52–53.

**156.** Phillipy Dep., at 101.

**157.** Call Dep., at 52–53.

**158.** Tillman Dep., at 78.

**159.** Warren Dep., at 35.

**160.** *See* Bice Dep., at 29; Fraley Dep., at 43.

**161.** Bice Dep., at 29.

**162.** Regenos Dep., at 29.

**163.** Fraley Dep., at 44; Corbett Dep., at 33; Rawlings Dep., at 90.

**164.** Fraley Dep., at 45.

**165.** Rawlings Dep., at 1115.

**166.** Warren Dep., at 15–16.

supports an inference that it is more likely than not that such materials were disposed of at the Site. Something more was needed to show that Dalton generated hazardous substances that were disposed of at the Site. Nothing more was presented.

Accordingly, Dalton's motion for summary judgment should be granted.

### D. GTE North, Inc.

■■■ GTE North, Inc. ("GTE") operated several Northern Indiana facilities—in North Manchester, Mentone, Bippus, Wabash, Silver Lake, and Atwood—from July 1973 through December 1978. Those facilities provided telephone service, stored new telephone equipment, and even maintained vehicles. LDS provided services to the facilities when Mr. Shambaugh operated LDS and the Site. GTE operated a fleet garage in North Manchester, which serviced GTE vehicles. The fleet garage and North Manchester office shared a common dumpster, which LDS serviced. LDS provided only compactor truck services, with the exception of the roll-off services provided to the Mentone and Bippus offices when they were under construction.

GTE contends it is entitled to summary judgment because the plaintiffs have no evidence that any GTE waste was disposed of the Site, and the uncontradicted evidence establishes that GTE's waste was not a hazardous substance. GTE contends that its waste was disposed only at the Spring Valley Landfill.

Mr. Shambaugh testified that GTE's waste was hauled not to Lakeland, but to the Spring Valley Landfill. No LDS books or records contradict this testimony; none of the books or records indicate whether any particular load of GTE waste was disposed of at the Site. LDS books and records establish merely that GTE was a general trash customer. Although Mr. Shambaugh stated that the Site may have been the closest landfill to GTE's facilities in Atwood, Mentone, and Silver Lake, he was uncertain about the approximate locations of those GTE facilities and had no recollection of serving those facilities.[167]

LDS driver Posey Lester also testified that GTE waste went to the Spring Valley Landfill. Mr. Lester stated that "[o]nce in a while" and "occasionally" someone named "Bob"[168] would haul a load from the Manchester route to the Site.[169] Mr. Lester testified that "[a]ll Wabash trash went to Spring Valley."[170] This only occurred when the LDS truck needed a maintenance job.[171] Mr. Lester had no recollection that he ever hauled GTE waste.[172]

Similarly, other LDS drivers—Richard Fruit, Larry Tillman, Robert Call, and Paul Phillipy—did not recall ever hauling GTE waste. Two LDS drivers, Donald Conley and Allen Regenos, testified that they never hauled any GTE waste. Mr. Call and Mr. Phillipy both testified that they had no knowledge that GTE hauled its own waste to the Site.

GTE's general dumpster trash consisted of ordinary office and business trash, including paper, empty janitorial supply and building maintenance containers, floor sweepings, discarded paint cans, paint stir sticks and brushes, used filters for heating and cooling units, empty oil and grease containers, empty solvent containers, and rags saturated with solvent, vinyl floor tiles, plastic bags with epoxy residue, paint thinner containers, adhesive containers, used generator oil filters, used oil filters, empty oil cans, used fuel filters, oil, metal containers for brake fluid and fluid residue, degreaser containers, small used auto parts (such as spark plugs, shock absorbers, and fan belts), used light bulbs, and cartridge ballasts. Only the Wabash Main and North Manchester facilities had a

167. Shambaugh Dep., at 707–709.

168. Apparently not Robert Call who had no recollection of ever hauling GTE waste.

169. Lester Dep., at 34–35. The plaintiffs assert that the same was true for the Wabash route, but Mr. Lester clearly stated that this occasional trip to the Lakeland site involved only the Manchester route.

170. *Id.,* at 36.

171. *Id.,* at 36.

172. *Id.,* at 219.

generator,[173] so all used generator oil filters were disposed of in the dumpster at either Wabash Main or North Manchester.[174] Each generator required two filters; GTE changed the four filters only once each year.[175]

The majority of these types of waste was disposed of exclusively at the Wabash facility. All discarded paint materials—paint cans, paint stir sticks and brushes, and paint thinner cans—from all GTE facilities in the Northern Indiana area were disposed of in the Wabash facility's dumpster.[176] Likewise, most empty solvent containers, rags saturated with solvents, and containers of degreaser, were disposed of at the Wabash facility.[177] Adhesive containers all were disposed of at the Wabash facility.[178] The plastic bags with epoxy residue were kept at the Wabash facility.[179] However, all vehicle maintenance waste (other than lubricants)—drained oil filters, empty oil cans, drained fuel filters, brake fluid cans, aerosol cans, and brake cleaner cans—was disposed of exclusively at the automotive waste dumpster at the North Manchester fleet garage.[180]

GTE disposed of its central office back-up storage batteries, vehicle maintenance lubricant wastes, scrap wire, and metals in drums or dumpsters that were separate from those which contained GTE's general trash; contractors other than LDS hauled those wastes. GTE collected all used phones and phone parts from the Wabash area and sent them to the GTE Fort Wayne office for repair.

That LDS hauled GTE waste does not prove that any GTE waste was disposed of at the Site. *B.F. Goodrich v. Murtha*, 815 F.Supp. 539, 544–45 (D.Conn.1993). The sole evidence in the record to suggest that any GTE waste was disposed of at the Site is the deposition testimony of LDS driver Paul Phillipy, who testified that "[o]nce in a while" and "occasionally" when an LDS truck need-

ed a maintenance job, a driver named "Bob" would haul a load from the Manchester route to the Site. Waste hauled from the North Manchester facility would have contained general business and office trash, and occasionally would contain used filters for heating and cooling units, vinyl floor tiles, and vehicle maintenance waste.[181]

Any inference that the occasional load of waste hauled from the Manchester area to the Site contained GTE waste would not be a reasonable inference. No evidence even suggests that the waste load hauled on occasion when the LDS truck needed maintenance contained any GTE waste. Assuming that the waste hauled when the LDS truck needed maintenance contained GTE waste, no evidence suggests that particular GTE waste would actually have contained used oil filters, vinyl floor tiles, or vehicle maintenance waste.

The plaintiffs have neither presented direct evidence that any GTE waste was disposed of at the Site nor shown a steady and predictable stream of hazardous waste taken to the Site. The plaintiffs have presented only a mere scintilla of evidence to support their claim against GTE, which is not sufficient to withstand GTE's motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To find for the plaintiffs, a factfinder would have to infer, first, that Robert Call, who has no recollection of ever hauling GTE waste, disposed of GTE waste at the Site when his truck occasionally needed servicing when he was hauling waste on the Manchester route; second, that GTE waste from the North Manchester facility occasionally contained hazardous substances; and third, that the GTE waste that was hauled from the North Manchester facility on the particular occasion

173. Hipskind Dep., at 65.

174. *Id.*, at 66.

175. *Id.*, at 66–67.

176. Hipskind Dep., at 54–56.

177. *Id.*, at 59–63.

178. *Id.*, at 64.

179. Metzger Dep., at 36–39.

180. Ogan Dep., at 27–33.

181. GTE's North Manchester fleet garage serviced approximately twenty-five vehicles. *See* GTE's Answers to Pltfs' Second Set of Interrogatories, No. 1(c), Brief in Opposition, Exh. 9.

the truck needed servicing contained hazardous substances. Such an a chain of inferences would be impermissible speculation based on conjecture.

GTE is entitled to summary judgment.

### E. Huber, Hunt & Nichols, Inc.

 Huber, Hunt & Nichols, Inc. ("Huber Hunt") contends that it is entitled to summary judgment because the plaintiffs have not presented evidence to establish, first, that Huber Hunt disposed of any hazardous substances, and, second, that Huber Hunt sent any hazardous substances to the Site.

Huber Hunt is a construction firm that contracted with Kosciusko County to construct a new hospital in Warsaw, Indiana from June 1974 to July 1976. LDS provided dumpsters at the hospital construction site and hauled away the trash and debris deposited in the dumpsters. The evidence shows that not all of the construction site trash was disposed of at the Site. No LDS driver, other than possibly Robert Call, has any recollection that the trash hauled from the construction site was anything other than general construction trash.

Almost all receipts, ledger sheets, and invoices establish merely that LDS hauled waste from the hospital construction site, and do not indicate the location to which the waste was hauled. The only document that specifically states where hospital waste was disposed of indicates that the waste went to the Custer Landfill, rather than to the Site. The parties dispute the precise number of times LDS provided hauling service and the volume of waste hauled, but these issues are not material to Huber Hunt's motion for summary judgment that relates solely to CERCLA liability, and not to damages.

The plaintiffs argue that the deposition testimony of Robert Call and Robert Richards (Huber Hunt's project superintendent at the hospital construction site) shows that Huber Hunt's waste contained such hazardous substances as discarded paint cans, paint stir-sticks and paint brushes, vinyl composite flooring tile, discarded containers of tile adhesive, and five gallon buckets containing roofing tar. The court's copies of those depositions apparently differ from the copies on which the plaintiffs rely.[182]

Mr. Richards expressly stated that no empty paint cans (also referred to as buckets) were discarded at the construction site,[183] and that the painter put the paint cans back in his car.[184] Mr. Richards could not recall whether the painter used paint stir-sticks,[185] but stated that the painter "put everything" in his vehicle and took it with him, including such painting supplies as paint brushes.[186] When asked whether some of the vinyl floor tile ended up being discarded, Mr. Richards stated, "It could be." [187] When asked whether containers of adhesive were discarded at the construction site, Mr. Richards answered that "you wouldn't see a bucket in that dumpster." [188]

---

**182.** The following dialogue reveals the distinction between the plaintiffs' interpretation and the evidence in the court's record:

Q: To your knowledge, did any of the discarded paint cans get into the roll-off?
A: No, they didn't.
Q: Is it possible that some made it in there that you didn't notice?
MR. CLARK: Calls for speculation.
A: Is it possible some made it that I did not know about?
Q: Yes.
MR. CLARK: Objection, speculation, obviously anything is possible.
A: Well, like Bruce said, anything's possible, I guess.
Richards Dep., at 116.

**183.** Richards Dep., at 116.

**184.** *Id.*, at 116–117.

**185.** *Id.*, at 117.

**186.** *Id.*, at 117–118.

**187.** Richards Dep., at 151.

**188.** Richards Dep., at 152; *see also* Richards Dep., at 153:

Q: So is it possible some of those containers that contained that adhesive ended up into the roll-off?
A: I don't remember any buckets, container like that being put in there, no.
Q: I suppose could it have happened without your knowing about it?
MR. CLARK: I guess anything is possible.
MR. JONES: Well, I'll let the witness answer that.
A: Well, like I say, I looked at the dumpsters all the time, daily basis, but like I say, I didn't see any, no.

The plaintiffs contend that Robert Call recalled seeing paint cans in the dumpster and "that five gallon buckets containing roofing tar, and shingles and tar paper were discarded at the construction site." [189] The court cannot find such testimony in Mr. Call's deposition. Mr. Call remembered that the roll-offs contained "miscellaneous trash, wood, paper, [and] five-gallon buckets. It was just miscellaneous trash." [190] Mr. Call could not remember seeing any paint cans in the roll-offs. [191]

The plaintiffs also argue that Mr. Call recalled "that five gallon buckets containing roofing tar, and shingles and tar paper were discarded at the construction site." [192] Mr. Call stated that the five-gallon buckets were basically empty, and that some of the buckets were open, some were closed. [193] Mr. Call added that "it looked like a tarry substance" was contained in the five-gallon buckets. [194]

Huber Hunt does not dispute that Mr. Call mentioned seeing shingles and tar paper, but Huber Hunt challenges Mr. Call's testimony on the ground that he has not identified the type of shingles or roof tar. Mr. Call's testimony as to shingles is contradicted by that of Mr. Richards, who indicated that no shingles were used on the hospital roof. [195] Huber Hunt contends that Mr. Call's testimony as to the contents of the five-gallon buckets is inadmissible speculation because there is nothing to indicate that Mr. Call had personal knowledge regarding the contents of the buckets or that he is competent to testify as to the contents.

Even if it is assumed that the plaintiffs have presented evidence that Huber Hunt generated some hazardous substances, Huber Hunt must prevail because the plaintiffs have not produced any evidence to show that those hazardous substances were disposed at the Site. Mr. Smith's affidavit is insufficient evidence to establish this issue; Mr. Smith expressly stated that he has assumed that at least some waste containing hazardous substances was taken from Huber Hunt to the Site. [196]

At best, the evidence is sufficient to show that some Huber Hunt waste went to the Site; the evidence does not support an inference that it is more likely than not that any of Huber Hunt's waste taken to the Site contained hazardous substances. Mr. Call initially testified that about 75%–80% of the "Kosciusko County Hospital project wastes" were hauled to the Site, [197] but later recanted his testimony and said that he could not remember "without guessing" how many roll-offs he took to the Site or the Packerton site. [198] Although the summary judgment stage is not the time to weigh evidence, it is noteworthy that Mr. Call even recanted his testimony concerning the number of times he picked up trash at the construction site. [199]

The plaintiffs quote Don Conley's testimony that he remembered hauling general construction trash from the hospital construction site to the Site, [200] but Mr. Conley stated that he was uncertain whether he remembered hauling trash from the hospital to the Site or to Ransbottom. [201] At best, Mr. Conley's testimony establishes that he hauled some of Huber Hunt's trash to the Site, but does not support a finding that he hauled waste containing hazardous substances to the Site. That LDS hauled Huber Hunt's waste proves neither the character nor the deposit site of

---

Q: It could have happened without your knowing about it?
A: Like Bruce said, it could have, could have.

189. Brief in Opposition, p. 74.

190. Call Dep., at 25.

191. Call Dep., at 25.

192. Brief in Opposition, p. 74.

193. Call Dep., at 165–166.

194. Call Dep., at 166.

195. Richards Dep., at 134.

196. Smith Aff., ¶ 16.

197. *Id.*, at 25–26.

198. *Id.*, at 168–169.

199. Call Dep., at 169.

200. *See* Brief in Opposition, pp. 72–73 (quoting Conley Dep., at 133–135).

201. Conley Dep., at 134.

that waste. *See B.F. Goodrich v. Murtha,* 815 F.Supp. at 544–545.

With all reasonable inferences in the plaintiffs' favor, the most the evidence shows is that Huber Hunt may have generated some waste containing hazardous substances, and that some of Huber Hunt's waste was taken to the Site, but it does not necessarily follow that the waste actually taken to the Site contained hazardous substances, *see B.F. Goodrich v. Murtha,* 815 F.Supp. at 544–545. The evidence is insufficient to bridge the two material issues; the plaintiffs have not shown that any of Huber Hunt's waste taken to the Site was the same waste that contained hazardous substances. Therefore, the plaintiffs cannot establish that Huber Hunt is liable under CERCLA, and Huber Hunt is entitled to summary judgment on the issue whether it is liable as a CERCLA responsible party.

Huber Hunt is entitled to summary judgment.

### F. K–Mart Corporation

■ K–Mart Corporation ("K–Mart") has operated a general merchandise retail store in Warsaw, Indiana since May 6, 1976. The Warsaw store generated solid waste, consisting of construction trash, packaging debris (cardboard, plastic, styrofoam, and paper), restaurant waste, light fixtures, damaged merchandise, metal counters, paint cans and paint wastes, tin cans, carburetor cleaner, and hangers. The Warsaw store's waste was collected and placed in a dumpster or roll-off compactor for pickup by the solid waste hauler. From July 1, 1973 through 1978, LDS picked up, hauled, and disposed of the Warsaw Store's waste. Some, but not all, of this waste was disposed of at the Site; LDS disposed of K–Mart waste at four or more different landfills.[202] Posey Lester, an LDS driver who picked up the Warsaw Store's solid waste and delivered it to the Site, testified that the waste included "[c]lothes, shoes, electric blankets, games, stuff like that, cardboard … [and] trash, too."[203]

Beginning on February 27, 1975, K–Mart operated a general merchandise retail store in Wabash, Indiana. Like the Warsaw store, the Wabash store generated solid waste consisting of construction trash, packaging debris (cardboard, plastic, styrofoam, and paper), restaurant waste, light fixtures, damaged merchandise, metal counters, paint cans and paint wastes, tin cans, carburetor cleaner, and hangers. The Wabash store's waste was collected and placed in a roll-off dumpster or compactor for pickup by the solid waste hauler.

The Wabash store was not a customer of LDS; rather, Sposeep & Sons, Inc. ("Sposeep & Sons") provided hauling and disposal service for the Wabash store from the opening of the store on February 27, 1975 through the end of 1978,[204] and disposed of all the Wabash store's waste at the Spring Valley Landfill.[205]

Additionally, the Wabash store had an automobile service center ("Wabash Auto Center") that generated non-recyclable solid waste and recyclable solid waste. The waste generated from the Wabash Auto Center was segregated, in a separate container, from the waste generated by the Wabash store's general merchandise retail operations. Wabash Auto Center's non-recyclable solid waste included oil, brake, coolant, and transmission fluid containers and residues, drained oil filters and transmission filters, brake springs and hardware, exhaust system parts, used

---

202. The plaintiffs claim that Robert Call testified that "most of the Warsaw store waste went to the Lakeland Landfill," citing Call Dep., at 29, 158. The court's review of Mr. Call's deposition finds no support for such a claim.

203. Lester Dep., at 195.

204. Sposeep Aff., ¶ 5.

205. Sposeep Aff., ¶ 6. The plaintiffs claim that Robert Call testified that some of the Wabash store waste went to the Lakeland site, depending on how full his packer truck became on a partic-

ular route. Brief in Opposition, p. 77 (citing Call Dep., at 28, 152–153). The court's review of Mr. Call's deposition does not support the plaintiffs' claim. When asked whether any Wabash store waste was taken to Lakeland, Mr. Call responded, "There might have been a few loads." Call Dep., at 28. Mr. Call testified that most of the Wabash store waste was taken to Packerton. *Id.* When asked whether he had any specific recollection of hauling waste from the Wabash store, Mr. Call answered, "I can't say for sure that we did." Call Dep., at 152.

shock absorbers, used spark plugs, oily towels, and degreaser residues. Wabash Auto Center's non-recyclable waste was collected and placed in an automotive dumpster for pickup by a waste hauler.

LDS hauled and disposed of Wabash Auto Center's nonrecyclable waste from July 1973 through the end of 1978. LDS hauled the non-recyclable waste to the Spring Valley Landfill; nonrecyclable waste was not disposed of at the Site.

Wabash Auto Center's recyclable solid waste included scrap tires, used automotive batteries, certain brake parts, used oil and transmission fluid, and used coolants. Salvageable automotive metal parts were collected and picked up by recyclers. Used oil and brake fluid was collected and stored in an underground tank, to be picked up by recyclers. Used coolant was collected and stored in 55–gallon drums to be picked up by recyclers. Brake shoes and batteries were collected and returned to their respective suppliers. Scrap tires were collected and picked up by a recycler. LDS did not haul or dispose of Wabash Auto Center's recyclable materials.

K–Mart contends that it is entitled to summary judgment on all claims asserted by the plaintiffs for two reasons: (1) the plaintiffs have presented no direct evidence that any K–Mart waste known to have been disposed of at the Site contained a hazardous substance; and (2) the plaintiffs have not presented any evidence that any K–Mart waste that may have contained a hazardous substance was disposed of at the Site.

K–Mart contends evidence that its waste was disposed of at the Site is insufficient to support a conclusion that K–Mart disposed of a hazardous substance at the Site. K–Mart asserts that the plaintiffs must present specific evidence of disposal of a known hazardous substance at the Site to establish K–Mart's liability. *See, e.g., United States v. Atlas Minerals & Chemicals, Inc.,* No. 91–5118, 1993 WL 518421, at *2 (E.D.Pa. Dec. 7, 1993) ("Absent some evidence on the actual composition of Kleinert's waste beyond mere speculation [affidavit containing an expert opinion about the composition of Kleinert's

office waste based upon knowledge of what office waste generally contains] as to what 'office waste' would likely contain ... summary judgment is unavoidable."); *B.F. Goodrich v. Murtha,* 840 F.Supp. 180 (D.Conn. 1993); *B.F. Goodrich v. Murtha,* 815 F.Supp. 539 (D.Conn.1993); *Barnes Landfill v. Town of Highland,* 802 F.Supp. 1087, 1088 n. 2 (S.D.N.Y.1992) ("[T]here should be some indication that a particular defendant contributed hazardous waste, not merely waste, to the landfill.").

The plaintiffs contend that wastes containing hazardous substances from both the Wabash and Warsaw stores were disposed of at the Site during the time period from July 1, 1973 through December 31, 1978. The plaintiffs rely on LDS invoices and accounts receivable records, as well as the testimony of former LDS employees and current K–Mart employees, regarding K–Mart's waste practices. As stated in *B.F. Goodrich v. Murtha,* 815 F.Supp. at 544–45, evidence that K–Mart did business with LDS "proves neither the quantity, the character nor the deposit site of waste." Therefore, LDS invoices and accounts receivable records do not establish that K–Mart disposed of hazardous waste at the Site.

The plaintiffs have not established that any K–Mart waste disposed of at the Site contained any specific hazardous substances. The only K–Mart waste identified at the Site consisted of clothes, shoes, electric blankets, games, cardboard, and other trash, none of which is a hazardous substance under CERCLA § 101(14). *See, e.g., B.F. Goodrich v. Murtha,* 815 F.Supp. at 545–46 ("The absence of evidence of breakdown of products that contain HS [hazardous substances] and the absence of identification of the product as a HS [hazardous substance] by the EPA precludes a finding that disposal of that product constitutes disposal of HS [hazardous substances]."). When asked whether he could identify any of the items that would have been in the waste taken from the Wabash store to the Site, Mr. Call answered, "I don't think anybody can do that," and added, "[C]an I say did I take [a] particular load? I

can't say that."[206]

The plaintiffs' failure to identify any hazardous substances in the K–Mart waste disposed of at the Site dooms the plaintiffs' claim against K–Mart. *United States v. Atlas Minerals & Chem.*, No. 91–5118, 1993 WL 518421, at *2; *B.F. Goodrich v. Murtha*, 815 F.Supp. at 545; *Barnes Landfill v. Town of Highland*, 802 F.Supp. at 1088. For the plaintiffs to prevail, the court must accept a string of inferences: "that *some* hazardous substance *may* have found its way into a K–Mart dumpster, and that dumpster load *may* have found its way to the Site."[207] As the court in *Barnes Landfill v. Town of Highland* reasoned:

> A showing of concrete facts supporting the CERCLA claims should be required before allowing this case to go forward, in order to assure that there is some factual basis for having initiated the litigation. Because of the importance of environmental protection ... it is particularly crucial that judicial intervention be founded on adequate factual allegations.

802 F.Supp. at 1088–1089.

■ The plaintiffs' claims against K–Mart must fail for a second independent reason: the plaintiffs have not presented evidence that K–Mart generated or disposed of hazardous substances. Assuming that K–Mart's waste contained paint cans, carburetor cleaner, and "bug bombs", as stated by Robert Call,[208] the plaintiffs' evidence is insufficient to prove that K–Mart disposed of hazardous substances. First, paint cans are not *per se* hazardous substances. *See Gallagher v. T.V. Spano Bldg. Corp.*, 805 F.Supp. 1120, 1126–1128 (D.Del.1992) (holding that disposal of construction debris, including empty paint cans, did not constitute disposal of hazardous substances). The plaintiffs' failure to identify the specific carburetor cleaner and "bug bombs" used, as well as their failure to identify the constituent elements of the specific carburetor cleaner and "bug bombs", prevents a finding that K–Mart disposed of hazardous substances. *See B.F. Goodrich v. Murtha*, 840 F.Supp. at 184; *B.F. Goodrich v. Murtha*, 815 F.Supp. at 545; *United States v. Serafini*, 750 F.Supp. 168, 171 (M.D.Pa.1990).

Second, that K–Mart's waste may have contained paint cans, carburetor cleaner, and bug bombs does not compel a finding that the K–Mart waste disposed of at the Site contained any of those items.

■ The plaintiffs rely almost exclusively on the inconsistent deposition testimony of Robert Call to create a genuine issue of material fact. The court has the discretion to disregard implausible claims. *City Environmental, Inc. v. United States Chemical Co.*, 814 F.Supp. 624, 632 (E.D.Mich.1993). A nonmoving party must present more persuasive evidence in support of an implausible claim to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Mr. Call was employed by LDS only during the period that David Lindsay owned LDS. Mr. Lindsay unequivocally testified that LDS did not go to Wabash for any customers.[209] Mr. Call could not identify any particular load of waste from the Warsaw store that had been delivered to the Site. Mr. Call's testimony about what he saw in the Wabash waste is implausible. Mr. Call stated that the Wabash Store waste contained "clothes, cosmetics, food, wood, paper, paint cans,"[210] but the undisputed testimony is that LDS picked up the Wabash Auto Center waste, not waste from the general store.[211] The undisputed testimony further establishes that the waste from the Wabash store and Wabash Auto Center were com-

---

**206.** Call Dep., at 154, 159.

**207.** Mem. of Law in Supp. of K–Mart's Mot. for Sum. Judg., p. 19.

**208.** *See* Call's Dep., at 154–157. Mr. Call stated that he would be unable to identify any specific K–Mart waste item. Call Dep., at 155.

**209.** Lindsay Dep., at 359–60.

**210.** Call Dep., at 27.

**211.** Sposeep Aff., ¶ 5.

pletely segregated.[212] Mr. Call incorrectly identified the LDS employee who accompanied him to K–Mart. The plaintiffs have no evidence to corroborate Mr. Call's testimony.

Even if Mr. Call's deposition testimony is credited, his testimony does not rebut K–Mart's explanation of how hazardous waste was segregated from the trash LDS hauled. Likewise, the plaintiffs' failure to identify the specific damaged merchandise allegedly discarded into the waste, as well as the constituents of that damaged merchandise hauled by LDS, prevents a finding that K–Mart disposed of hazardous substances. Defective merchandise was returned to the vendor; damaged merchandise was sold at a reduced price. Non-salvageable leaking paint cans were donated to a homeless shelter. The plaintiffs alleged that various items, such as water-based paint, coolants, and automobile related fluids, would likely contain hazardous substances, but the evidence is that most (if not all) of these items were contained in plastic, cardboard, or metal containers unlikely to break while in a store. Mr. Lester's observations were consistent with K–Mart's explanation, and Mr. Call testified that while he saw other things, he could not identify any specific K–Mart waste item.

Further, there is no evidence that K–Mart waste was taken to the Site as opposed to Spring Valley, although Mr. Call conceded that anything is possible. The plaintiffs ask the court to assume, without evidence, first that K–Mart disposed of a particular product; second, that product contained a particular hazardous substance; and third, that the product was disposed at the Site. The plaintiffs need to provide evidence of actual disposal of K–Mart waste containing an identified hazardous substance that is similar to a hazardous substance identified at the Site.

Because the plaintiffs have not presented such evidence, K–Mart is entitled to summary judgment.

Accordingly, K–Mart's motion for summary judgment must be granted.

### G. Liberty Homes, Inc.

■ Liberty Homes, Inc. ("Liberty") is a mobile home manufacturer that operates a plant in Syracuse, Indiana. Liberty was a roll-off customer of LDS for a few months beginning in April 1978. Mr. Shambaugh testified that no Liberty waste was disposed of at the Site,[213] and that the Site was closed during the summer of 1978.[214] LDS picked up waste from Liberty on an "on-call" basis rather than on a regular schedule.[215] None of the drivers for LDS when Liberty was a customer recall disposing of Liberty waste at the Site.[216] No Liberty representatives have any personal knowledge of where LDS hauled Liberty's waste.[217]

Liberty contends that the plaintiffs have failed to present evidence sufficient to support a finding that any of Liberty's waste was disposed at the Site, or that Liberty disposed of any hazardous substances at the Site.

Again, the deposition testimony to which the plaintiffs cite in an effort to create a genuine issue of material fact seems to be missing from the court's copy of the record. Although the plaintiffs allege that Robert Lantz [218] stated that "he had no evidence that Liberty's waste transported by LDS was disposed of at any location except at the Lakeland Landfill,"[219] Mr. Lantz actually stated that he had no personal knowledge of where Liberty's waste was transported.[220]

Although the plaintiffs allege that Paul Phillipy testified that he "frequently hauled

---

212. Cupp Dep., at 78–81.

213. Shambaugh Dep., at 584–585.

214. Id., at 593–594.

215. Lantz Dep., at 16.

216. Conley Dep., at 144–146, 186–188; Lester Dep., at 199–200; Phillipy Dep., at 64–69; Till-

man Dep., at 83–84 (all Liberty waste he hauled went to Scott's Landfill).

217. Lantz Dep., at 15–16, 43.

218. Mr. Lantz was responsible for waste disposal at the Liberty plant.

219. Brief in Opposition, p. 82 (citing Lantz Dep., at 13–16, 19–20).

220. Lantz Dep., at 15–16.

roll-offs and compactor containers from Liberty ... of which he believes approximately 10% was disposed of at the Lakeland Landfill," [221] Mr. Phillipy actually testified that he disposed of Liberty's waste at Scott's Landfill.[222] Mr. Phillipy added that "it might be on a rare occasion that a guy's out a little late and he can't dump at these other landfills because they're closed ... so he might take it on back and ... and dump it at Lakeland." [223]

The plaintiffs assert that Posey Lester testified that he "hauled Liberty wastes, including containers of glue, which he thought may have been transported to the Lakeland Landfill," [224] and that Donald Conley stated that "he hauled roll-offs from Liberty several times per week, and that some of these wastes were disposed of at the Lakeland Landfill." [225] In reality, both Mr. Lester and Mr. Conley testified only that "it is possible" that Liberty's waste "could have" gone to Lakeland, but that "most" went to Scott's.[226] Both Mr. Lester and Mr. Conley specifically stated that they could not recall taking Liberty waste to Lakeland.[227]

The plaintiffs also rely on the deposition testimony of Robert Call to establish that Liberty waste was disposed of at the Site, but Mr. Call testified that he only worked for LDS during the Lindsay era, and that he last worked for LDS in 1975. Liberty was not a customer of LDS until 1978; even the plaintiffs concede that LDS hauled waste for Liberty only during 1978. Thus, Mr. Call would have no knowledge of whether Liberty's waste was disposed of at the Site.

The cases cited by the plaintiffs, *Arizona v. Motorola, Inc.,* 774 F.Supp. 566 (D.Ariz. 1991), *Massachusetts v. Blackstone Valley Elec. Co.,* 808 F.Supp. 912 (D.Mass.1992), and *United States v. New Castle County,* 769 F.Supp. 591 (D.Del.1991), do not support the plaintiffs' contention that they have present-

ed sufficient evidence that Liberty disposed of waste at the Site. In those cases, drivers for the waste hauler (as well as the facility's owner in *Motorola* ) testified that they disposed of the defendants' waste at the CERCLA facility. *See Arizona v. Motorola,* 774 F.Supp. at 576; *Massachusetts v. Blackstone Valley,* 808 F.Supp. at 915; *United States v. New Castle County,* 769 F.Supp. at 599. The defendant in *Blackstone Valley,* 808 F.Supp. at 915, did not dispute that its waste was taken to the facility, and the defendant in *Motorola,* 774 F.Supp. at 575, admitted that its waste was disposed of at the facility. In contrast, Liberty has not admitted, but rather disputes, the plaintiffs' allegation that any of its waste was disposed of at the Site. The LDS drivers did not recall disposing of Liberty's waste at the Site.

No other evidence establishes that Liberty's waste was disposed of at the Site; the evidence shows that the contrary is true. That LDS provided roll-off services to Liberty for a few months in 1978 does not compel the conclusion that Liberty's waste was disposed of at the Site. Importantly, the Site was closed shortly after Liberty first became a customer of LDS. Mr. Shambaugh, then owner of LDS, testified that no Liberty waste was taken to the Site. Therefore, the plaintiffs have not come forward with evidence that Liberty waste was disposed of at the Site.

The plaintiffs rely on the deposition testimony of LDS drivers and former Liberty employees, as well as Mr. Smith's affidavit, to support their allegation that Liberty generated waste containing hazardous substances and that LDS hauled that waste on some occasions. Assuming these facts to be true, the plaintiffs cannot survive summary judgment. Mere generation of waste containing hazardous substances is not sufficient to prove that hazardous substances were dis-

---

**221.** Brief in Opposition, p. 83 (citing Phillipy Dep., at 31–32, 65, 66–70).

**222.** Phillipy Dep., at 66–68.

**223.** *Id.,* at 67–68.

**224.** Brief in Opposition, p. 83 (citing Lester Dep., at 199–200).

**225.** Brief in Opposition, p. 83 (citing Conley Dep., at 145).

**226.** Lester Dep., at 199–200; Conley Dep., at 145.

**227.** *Id.*

posed of at a particular site. *B.F. Goodrich v. Murtha*, 815 F.Supp. 539, 544 (D.Conn. 1993). That LDS may have hauled loads of waste containing hazardous substances does not prove that such waste was disposed of at the Site. 815 F.Supp. at 544–45. That Liberty may have generated hazardous substances is inconsequential because the plaintiffs have not provided the necessary connection between any hazardous substances and the Site. Thus, the plaintiffs have not established that LDS hauled any Liberty waste containing hazardous substances to the Site.

Liberty is entitled to summary judgment.

*H. R.R. Donnelley & Sons Company, Inc.*

■ R.R. Donnelley & Sons Company, Inc. ("Donnelley") contends that the plaintiffs have failed to present evidence that could establish that Donnelley disposed of any hazardous substances at the Site.

Donnelley operates a printing facility in Warsaw, Indiana. Donnelley generated a waste ink and solvent mixture which was drummed for off-site disposal.[228] Debra Woodward described the mixture as a "multicolored sludge".[229] This waste ink and solvent mixture was not disposed of at the Site.[230]

LDS hauled twenty-two barrels (or drums) and 1140 gallons of bulk liquids designated as unspecified "chemicals" from Donnelley in 1974.[231] Mr. Lindsay, owner of LDS in 1974, could not recall the specific transaction and did not know what type of waste LDS hauled for Donnelley.[232] Mr. Lindsay stated that generally materials characterized as "chemicals" would have been "hazardous" waste,[233] and defined "hazardous waste" as any waste for which he needed State approval to handle.[234]

Robert Call was the only driver who recalled taking any drums from Donnelley to the Site.[235] Mr. Call believed the drums contained inks, but admitted that he had no idea what was contained in the drums.[236] Donnelley employees testified that all waste containing hazardous substances—plating wastes and ink wastes—were disposed at sites other than Lakeland.[237]

LDS records indicate that LDS hauled five to six roll-offs for Donnelley in 1977,[238] and also picked up roll-offs in August and September 1978. Mr. Shambaugh testified that except for a six-month period, probably in the late fall of 1977, when he believed he needed to mix trash with Guide Lamp's sludge, he accepted no trash at the Site.[239] Mr. Shambaugh testified that no Donnelley trash picked up by LDS in August or Sep-

---

**228.** Reynolds Dep., at 19–22; Kispert Dep., at 57–58; Woodward Dep., at 19–20.

**229.** Woodward Dep., at 19–20.

**230.** Sincroft Dep., at 11–15, 25–30, 37, 48–49; Kispert Dep., at 24–25; Faulkner Dep., at 24, 31; Reynolds Dep., at 17–18, 24.

**231.** Document No. S100799 (*See* Exh. 8 to Pltfs' Brief in Opposition). The plaintiffs contend that the twenty-two barrels or drums contained waste inks and that the 1140 gallons of liquid waste contained plating wastes. Brief in Opposition, pp. 55–58.

**232.** Lindsay Dep., at 426–430. Contrary to the plaintiffs' assertion, Brief in Opposition, p. 56 (citing Lindsay Dep., at 429–30), Mr. Lindsay did not testify that LDS hauled liquid wastes from Donnelley as the result of a printing press cleanout and that the liquid wastes were disposed of at the Site. Rather, Mr. Lindsay testified that it might have been ink sludge from cleaning the printers, but that he did not know whether it was ink sludge. Lindsay Dep., at 430.

**233.** Lindsay Dep., at 154.

**234.** *Id.*, at 154.

**235.** Call Dep., at 33–36, 373, 377–379.

**236.** *Id.*, at 34–35, 382–384.

**237.** Sincroft Dep., at 11–15, 25–30, 37, 48–49; Faulkner Dep., at 24, 31; Reynolds Dep., at 17–18, 24; Kispert Dep., at 24–26, 43.

**238.** Some of the records indicate that the waste was hauled on behalf of a contractor, Henry & Williams, that performed construction work for Donnelley. Donnelley denies that it is liable for any waste hauled on behalf of Henry & Williams. The court need not decide whether Donnelley is liable for that waste because the plaintiffs have not established that any of the roll-offs hauled in 1977 were actually disposed of at the Lakeland site.

**239.** Shambaugh Dep., at 64–65, 88, 671–672.

tember 1978 was disposed of at the Site.[240] Even during those six months, LDS continued to dispose of trash at other landfills.[241] The Site had ceased accepting trash by the summer of 1978.[242] Although LDS continued to operate as a waste hauling business, the Site closed in August 1978.[243]

LDS hauled trash to other landfills in August 1978. Several 1978 landfill tickets show that Donnelley's waste went to the Ransbottom (Packerton) Landfill. Only general plant trash was in the roll-offs at Donnelley.[244] Roll-offs would not have contained hazardous waste because Donnelley segregated the wastes with hazardous substances from general plant trash.[245] Moreover, the charge reflected in LDS records for each of those roll-offs indicated that LDS hauled general trash rather than hazardous waste for Donnelley.[246]

LDS was required to submit to the State of Indiana "SPC–17" forms that identified all liquid hazardous wastes hauled. LDS's SPC–17 forms indicate that no liquid hazardous wastes were disposed of at the Site after August 1, 1978.[247]

The plaintiffs have the burden of proving by a preponderance of the evidence that Donnelley's waste actually was disposed of at the Site. That is, they must prove that more likely than not that Donnelley's waste was disposed of at the Site. *See Hale v. Dept. of Transp., F.A.A.,* 772 F.2d 882, 885 (Fed.Cir. 1985). The record before the court shows that during the Shambaugh era most, if not all, roll-off wastes were disposed of at landfills other than the Site. Mr. Shambaugh and former LDS drivers agree that a substantial majority of roll-off waste was hauled to landfills other than the Site in 1977 and 1978. The Site accepted trash only during a six-month period in 1977. The evidence further shows that the Site did not accept any roll-off waste in the summer of 1978 and closed in August 1978. The only evidence even favorable to the plaintiffs is the testimony of Mr. Conley and Mr. Call that Donnelley roll-off waste might have been taken to the Site or to other landfills.

Given this evidence, no reasonable factfinder could find by a preponderance of the evidence that Donnelley's 1977 or 1978 roll-off waste was disposed of at the Site. The plaintiffs have not presented any evidence that the five or six roll-offs hauled in 1977 were hauled during the six months in

**240.** Shambaugh Dep., at 593–595. The plaintiffs mistakenly rely on the testimony of three LDS drivers, Mr. Conley, Mr. Phillipy, and Mr. Call, to support their contention that Donnelley roll-offs were disposed of at the Site. *See* Brief in Opposition, p. 59 (citing Conley, Phillipy, and Call deposition testimony). The drivers' testimony does not contradict Mr. Shambaugh's testimony that no Donnelley wastes were disposed of at the Site in August or September 1978.

Although Mr. Conley said that he disposed of Donnelley "construction waste" "once in a while", Conley Dep., at 148, he said nothing about disposing of any Donnelley waste in August or September 1978. *Id.* Moreover, Mr. Conley was unsure of where he disposed of Donnelley roll-offs; he testified, "I don't remember" where Donnelley's waste was taken, but that it "could have been taken to Ransbottom." Conley Dep., at 195.

So, too, Mr. Phillipy testified that he disposed of Donnelley roll-offs at the Site, but he did not testify that he did so in August or September 1978. Phillipy Dep., at 200–201. Rather, Mr. Phillipy testified that there came a time when the Site did not accept trash, but continued to accept hazardous waste. Phillipy Dep., at 168–170.

Mr. Call's testimony to which the plaintiffs refer, *see* Brief in Opposition (citing Call Dep., at 36), refers to the drums or barrels which LDS allegedly hauled for Donnelley in 1974; the testimony does not relate to any roll-offs hauled in 1977 or 1978. Mr. Call did testify that he sometimes hauled "miscellaneous things like paper, things like that" from Donnelley, but that the waste would go to "probably the Lakeland site or other site." Call Dep., at 378. Mr. Call did not state that he actually took any roll-offs to the Site.

**241.** Shambaugh Dep., at 65.

**242.** *Id.,* at 591.

**243.** *Id.,* at 501, 577.

**244.** Faulkner Dep., 22–27; Kispert Dep., 33–3, 43, 45–46, 75–76; Sincroft Dep., at 16–17, 30–31, 41–42; Woodward Dep., at 37.

**245.** Faulkner Aff., ¶ 19.

**246.** Lindsay Dep., at 101–103; Shambaugh Dep., at 69.

**247.** *See* Donnelley's Mot. for Sum. Judg., Exh. 14, Document No. 100045.

which the Site was accepting trash, let alone that the five or six roll-offs actually were disposed of at the Site. Nothing in the record would support an inference that the roll-offs hauled in August and September were disposed of at the Site; rather, the evidence shows that the Site was not accepting roll-off waste in the summer of 1978 and the Site was closed in August 1978.[248]

The testimony of Mr. Conley and Mr. Call is not sufficient to establish that Donnelley's roll-off waste "more likely than not" was disposed of at the Site in 1977 and 1978. Further, even if some Donnelley's roll-off waste was disposed of at the Site, the plaintiffs must prove that the roll-off waste actually disposed of at the Site contained a CERCLA hazardous substance. Disposal of non-hazardous waste does not prove disposal of hazardous substances. *B.F. Goodrich v. Murtha,* 815 F.Supp. 539, 544 (D.Conn.1993). Thus, evidence that some Donnelley waste was disposed of at the Site does not prove that Donnelley disposed of hazardous substances. "Disposal, not generation, creates liability." *Id.*

The plaintiffs contend that the Donnelley's "mixed wastes" and construction debris hauled by LDS in roll-offs contained hazardous substances, including unidentified plasticizers, solvents, and PAHs, which have been identified at the Site.[249] The plaintiffs contend that Donnelley's mixed wastes contained (1) paper towels contaminated with toluene, ink, and paint; (2) oil filters from printing press and vehicle maintenance; (3) discarded one gallon oil base paint cans; (4) oily sludge

from equipment degreasing tank; and (5) construction debris, including compressed air piping.[250] None of the deposition testimony cited by the plaintiffs supports this contention.

Contrary to the plaintiffs' assertion, the evidence does not establish that Donnelley's waste contained paper towels contaminated with toluene, ink, and paint. Ms. Woodward testified that Donnelley used cloth towels to wipe down cylinders; these cloth towels were sent to the laundry.[251] Mr. Kispert testified that paper towels were used to clean cylinders which had been cleaned with a toluene solvent, but Donnelley incinerated all paper towels in its own incinerator, which was in operation until 1980.[252] Mr. Faulkner also testified that Donnelley used cloth towels rather than paper towels, except for some time between 1974 and 1978 when paper towels were tried once or twice.[253]

Mr. Faulkner did testify that Donnelley would paint on occasion—every three months—and that empty paint cans would go into the general trash.[254] Mr. Sincroft testified that "wipes" were used to wipe off cylinders, but he testified that he did not work in the cylinder department and did not know whether the wipes were used before or after a solvent was used.[255] Mr. Sincroft also testified that employees could wash their hands and dry them on paper towels,[256] but that employees normally did not get ink or solvent on their hands.[257]

Thus, the evidence shows that when paper towels were used to wipe down cylinders on

---

**248.** Mr. Tatum's affidavit, *see* Tatum Aff., ¶ 12 (concluding that each defendant contributed waste to the Site "from May, 1974 through and including August, 1978"), is not evidence as to whether the Site was accepting roll-off waste in August 1978. Mr. Tatum does not specifically indicate whether his opinion is limited to hazardous waste or whether it includes general waste or trash. Furthermore, Mr. Tatum has no personal knowledge whether the Site accepted roll-off waste in August 1978. Conclusory opinions in affidavits do not create a genuine issue of material fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Toro Co. v. Krouse, Kern & Co.,* 644 F.Supp. 986, 989 (N.D.Ind.1986).

**249.** *See* Brief in Opposition, p. 63 (citing Smith Aff., ¶ 30).

**250.** *See* Brief in Opposition, pp. 62–63.

**251.** Woodward Dep., at 41.

**252.** Kispert Dep., at 15, 28–29, 37.

**253.** Faulkner Dep., at 29–30.

**254.** Faulkner Dep., at 43–44.

**255.** Sincroft Dep., at 45.

**256.** *Id.,* at 45.

**257.** *Id.,* at 46.

one or two occasions between 1974 and 1978, the paper towels were necessarily incinerated in Donnelley's on-site incinerator. The evidence also shows that approximately every three months, Donnelley would paint and the paint cans would go into the trash, but the plaintiffs have offered no admissible evidence to establish that the paint cans contained hazardous substances.[258] The evidence further shows that Donnelley employees normally would not get ink or solvent on their hands; the employees could first wash their hands and then dry them on paper towels. This scintilla of evidence is insufficient to allow a factfinder to find, by a preponderance of the evidence, that paper towels contaminated with toluene and ink were disposed of in Donnelley's trash hauled by LDS.

Contrary to the plaintiffs' assertion,[259] the evidence does not establish that Donnelley's roll-off waste contained oily sludge from equipment degreasing tank. To support their assertion, the plaintiffs rely solely on Mr. Kispert's deposition testimony. Mr. Kispert, however, specifically testified that he could only speculate as to where the oily sludge may have been disposed.[260] Mr. Kispert testified that he did not witness the operation, but speculated that the oily sludge "could have" been disposed of in the general trash.[261] Mr. Kispert's speculative testimony does not create a genuine issue of material fact as to whether Donnelley's roll-off waste contained oily sludge. *See, e.g., Thomas v. FAG Bearings,* 846 F.Supp. 1382, 1398 (W.D.Mo.1994) (a party may not survive summary judgment on mere speculation alone), *on reconsideration in part on other grounds sub nom. Thomas (Elaine) v. FAG Bearings Corp.* 860 F.Supp. 663 (W.D.Mo.1994).

The plaintiffs have not presented admissible evidence that could establish that oil filters from a printing press and from vehicle maintenance or discarded one gallon oil base paint cans contained hazardous substance. These materials are not EPA–designated hazardous substances. *See* 42 U.S.C. § 9614; 40 C.F.R. § 304 (1993). The only evidence the plaintiffs present to prove that these materials contained hazardous substances is the expert affidavit of Mr. Smith, who opines that "oil filters likely contained wear metals found amount the hazardous metals at the site" and that "paints ... contain hazardous metal pigments and plasticizers." [262]

Mr. Smith's opinion would not warrant a finding that Donnelley's oil filters contained hazardous substances. First, Mr. Smith did not opine that all oil filters contain wear metals or that the particular oil filters allegedly generated by Donnelley would contain wear metals. Second, Mr. Smith does not identify the particular "wear metals" to which he refers and, by inference, opines were contributed to the Site by Donnelley.[263] Therefore, Mr. Smith's opinion is insufficient to support a finding that Donnelley disposed of hazardous substances—unspecified wear metals—at the Site. *See B.F. Goodrich v. Murtha,* 840 F.Supp. 180, 184 (D.Conn.1993).

For similar reasons, Mr. Smith's opinion cannot establish that any paint cans allegedly discarded by Donnelley contained hazardous substances. Mr. Smith does not identify the particular metals—cadmium, lead, chromium, or barium—or the particular plasticizers contained in the paint actually used by Donnelley and, by inference, allegedly contributed to the Site by Donnelley. Thus, Mr. Smith's

**258.** The plaintiffs offered Mr. Smith's generalized opinion that "inks or paints disposed on paper towels contain hazardous metal pigments and plasticizers." Smith Aff., ¶ 30. Mr. Smith does not opine that the paints actually used by Donnelley contained hazardous substances; the plaintiffs offer no evidence to show that Mr. Smith had any knowledge regarding the types of paint used by Donnelley. Furthermore, Mr. Smith did not identify the type of "metal pigments" or "plasticizers" that are allegedly hazardous substances. Finally, the court notes that Mr. Smith bases his opinion on certain facts not in evidence: Mr. Faulkner never stated that paints were disposed of on paper towels.

**259.** *See* Brief in Opposition, pp. 62–63.

**260.** "I can only speculate on where it might have—or what might have happened to it, but I did not witness the operation." Kispert Dep., at 87–88.

**261.** Kispert Dep., at 88.

**262.** Smith Aff., ¶ 30.

**263.** Mr. Smith includes zinc, cadmium, chromium, nickel, and lead in the category "wear metals". Smith Aff., ¶ 11.

opinion cannot be sufficient to establish that Donnelley disposed of hazardous substances—unspecified metals and plasticizers—at the Site. *See B.F. Goodrich v. Murtha*, 840 F.Supp. at 184. Unless the plaintiffs can prove the particular hazardous substances that Donnelley allegedly contributed to the Site, the plaintiffs cannot prove that hazardous substances similar to those allegedly contributed by Donnelley were found at the Site.

Assuming that some amount of any of these substances—ink, toluene (solvent), paint, oil filters, discarded one gallon paint cans, or oily sludge—was disposed of in the roll-off waste, the plaintiffs have not presented evidence from which it could be found by a preponderance of the evidence that the roll-off or roll-offs into which any of the substances were disposed were hauled to the Site. Given the testimony as to the infrequency that Donnelley generated these substances,[264] as well as the testimony that all or almost all of Donnelley's roll-off waste went to other landfills, it amounts to mere speculation to say that any roll-off that may have contained any of these substances was disposed of at the Site.

The plaintiffs have not presented any evidence that any construction debris hauled from Donnelley by LDS contained hazardous substances. The plaintiffs cite the testimony of Mr. Faulkner and Ms. Woodward in support of their claim that the construction debris included compressed air piping.[265] Mr. Faulkner did not testify as to the contents of any construction debris.[266] Ms. Woodward merely speculated that the construction debris might have contained "sections of [compressed air] pipe that are not long enough to be utilized."[267]

From Ms. Woodward's speculative testimony, the plaintiffs' expert, Mr. Smith, opines that the piping would have been likely coated by oils from the air compressor which would have contained PAHs [a hazardous substance detected at the Site].[268] In reaching this opinion, Mr. Smith assumes, first, that the compressed air piping was connected to a functioning air compressor, second, that the piping became coated in oils from the air compressor, and, third, that the unidentified "oils" contained unidentified PAHs. Neither Ms. Woodward's testimony nor any other evidence indicates that the compressed air piping had been used or connected to a functioning air compressor. Mr. Smith's opinion regarding the compressed air piping is inadmissible because it lacks an adequate factual basis. *Thomas v. FAG Bearings Corp.*, 846 F.Supp. at 1394; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993).

Without evidence of the actual composition of Donnelley's roll-off waste beyond mere speculation, the plaintiffs cannot survive summary judgment. "Mere speculation and assumption that these materials [types of hazardous substances] were sent to the site are insufficient to demonstrate a genuine issue." *United States v. Atlas Minerals & Chem.*, No. 91–5118, 1993 WL 518421, at *2 (E.D.Pa. Dec. 7, 1993); *see also B.F. Goodrich v. Murtha*, 815 F.Supp. at 544 (rejecting expert affidavit claiming that certain types of hazardous substances may have been present in the waste of the type of generator-defendant). Thus, Mr. Smith's testimony that certain types of hazardous substances may be present in Donnelley's waste[269] cannot defeat summary judgment because there is no evi-

---

**264.** The evidence shows that paper towels were used to wipe down cylinders only once or twice between 1974 and 1978, Faulkner Dep., at 29–30; about every three months, Donnelley would paint and the paint cans would go into the trash, Faulkner Dep., at 43–44; oil filters from a printing press may have been disposed once or twice per year, Kispert Dep., at 79; Donnelley may have disposed oil filters used in maintaining two or three vehicles, Faulkner Dep., at 48–49; and Donnelley generated only one gallon of sludge from the degreasing tank each year. Kispert Dep., at 88.

**265.** *See* Brief in Opposition, p. 63 (citing Faulkner Dep., at 63; Woodward Dep., at 39–44).

**266.** Faulkner Dep., at 63.

**267.** Woodward Dep., at 44.

**268.** Smith Aff., ¶ 30.

**269.** *Id.*, ¶¶ 28–30.

dence that those particular types of hazardous substances were actually disposed of at the Site. The plaintiffs have not satisfied their burden of coming forth with evidence sufficient to prove that Donnelley's roll-off wastes contained hazardous substances; summary judgment in Donnelley's favor with respect to the roll-off wastes is appropriate.

Furthermore, assuming LDS hauled Donnelley "chemicals" to the Site in 1974,[270] Donnelley is entitled to summary judgment because the plaintiffs have not shown that the "chemicals" were CERCLA "hazardous substances." Mr. Lindsay could not recall the particular shipment or shipments and did not know what type of waste LDS may have hauled for Donnelley. Mr. Lindsay testified that materials characterized as "chemicals" would have been "hazardous" wastes; but LDS hauled those chemicals in 1974, six years before CERCLA was enacted. Thus, Mr. Lindsay's characterization of a material as "hazardous" in 1974 would not equate with a finding that the material is a "hazardous substance" under CERCLA. Even Mr. Call, the only LDS driver who remembered hauling drums from Donnelley, stated that he had no idea what the drums contained.[271]

To show that the "chemicals" were disposed of at the Site, the plaintiffs offer the letter issued by the State of Indiana authorizing LDS to transport and dispose of Donnelley's plating sludges.[272] After reviewing the letter, Mr. Lindsay specifically testified that he did not haul the hydroxide sludge described in the letter.[273] He explained that he did not haul every substances for which he was given state approval.[274] The plaintiffs have not come forth with evidence that the Donnelley "chemicals" allegedly disposed of at the Site contained hazardous substances. Therefore, Donnelley is entitled to judgment as a matter of law with respect to the "chemicals" hauled in 1974.

■ Finally, the plaintiffs contend that Donnelley is responsible for wastes allegedly hauled by Worley's Disposal, another area waste hauling company. At times, Donnelley used Worley's to haul general trash.[275] Worley's provided compactor truck service to Donnelley.[276] The plaintiffs offer twelve landfill tickets indicating that Worley's disposed of compactor truck waste at a Kosciusko County Landfill,[277] but none of these landfill tickets indicate that the waste disposed came from Donnelley, as opposed to any other of Worley's customers. The plaintiffs have presented absolutely no evidence that any waste allegedly hauled by Worley's was disposed of at the Site. Therefore, Donnelley is entitled to summary judgment with respect to waste allegedly hauled by Worley's and disposed of at the Site.

Accordingly, Donnelley's motion for summary judgment must be granted.

### I. Syracuse Rubber Products, Inc.

■ Syracuse Rubber Products, Inc. ("Syracuse Rubber"), located in the City of Syracuse, Indiana, manufactured molded rubber goods, including seals, bumpers, bushings, grommets, and molds for producing the rubber goods. Syracuse Rubber mixed up to one hundred batches of raw rubber daily to produce the rubber goods and also mixed various additives into the raw rubber.[278] Syracuse Rubber also manufac-

---

270. Donnelley employees testified that the drummed waste ink and solvent mixture went to sites other than Lakeland.

271. By admitting that he did not know what substances were contained in the drums, Mr. Call essentially recanted his earlier statement that he believed the drums contained inks. There is no evidence that unspecified or generic "inks" are hazardous substances as defined by CERCLA § 101(14), 42 U.S.C. § 9601(14).

272. See Brief in Opposition, Exh. 8(B)(1), Document Nos. RR000080 and RRD00098.

273. Lindsay Dep., at 367–368.

274. Id., at 366.

275. Kispert Dep., at 43; Faulkner Dep., at 33.

276. Faulkner Dep., at 33; Kispert Dep., at 43.

277. Brief in Opposition, Exh. 8(B)(4).

278. The additives included copper dimethyldithiocarbamate; lead oxide paste; dibasic lead phosphite; salicylic acid in oil; lead oxide in hydrocarbon oil; zinc demethyldithiocarbamate; zinc chloride/benzothiazyl-disulfide; zinc yellow; zinc oxide, oleic acid in petroleum factions; nickel dibutyldithiocarbamate; naphthionic oil

tured metal molds that it used to produce its rubber goods.

Syracuse Rubber generated general plant trash waste and liquid wastes, as well as a small amount of scrap metal used in the mold-making process. Syracuse Rubber accumulated the liquid wastes and scrap metal on-site. Scott's Landfill transported and disposed of the liquid wastes. Syracuse Rubber sold the scrap metal to salvage companies. LDS handled neither the liquid wastes nor the scrap metal.

Syracuse Rubber was a customer of LDS from around July 1974 to mid-October 1976, and again from October 1977 through December 1978. Although LDS provided primarily roll-off services, it also provided compactor truck services to Syracuse Rubber. Syracuse Rubber placed its general plant trash in a roll-off container or dumpster to be picked up and disposed of by LDS. The additive packaging—buckets, drums, cans, boxes, and paper sacks—was disposed of in the general Syracuse Rubber waste. These containers may have contained additive residues.

Former LDS driver Alan Regenos testified that "[t]here could have possibly been" cardboard drums and large paper bags in the roll-offs which he hauled.[279] Rick Fruit, an LDS compactor truck driver, initially testified that he could not recall what was in the Syracuse Rubber waste, but then stated that the waste contained sheets of rubber with a white powder, as well as some paper products.[280] Paul Phillipy, who hauled Syracuse Rubber roll-off waste on a weekly basis,[281] testified that the roll-offs contained rubber by-products, wood, skids, vinyl, a "light dark" powder, trash, and paper.[282] Robert Call testified that the waste contained miscellaneous trash, like wood and paper, five-gallon

buckets, and bags; he was unsure whether the bags contained some "powdery stuff".[283]

Syracuse Rubber contends that the plaintiffs cannot prove that its waste was disposed of at the Site and that such waste actually contained a hazardous substance. Syracuse Rubber concedes that it used hazardous substances at its facilities while it was a customer of LDS and that the evidence shows that hazardous substances could have been placed in a dumpster or roll-off container during that time, but contends that no evidence establishes that any roll-off or dumpster containing its waste was actually disposed of at the Site. Syracuse Rubber also contends that the plaintiffs have not identified any hazardous substance in waste from Syracuse Rubber.

The plaintiffs allege that Syracuse Rubber generated wastes containing hazardous substances on a daily basis, which were "continuously disposed of" in LDS containers. On that basis, the plaintiffs contend that hazardous substances were "ubiquitous" in Syracuse Rubber wastes hauled by LDS, and the plaintiffs, therefore, conclude that "regardless of which particular loads were disposed of at the Lakeland Landfill, they would have contained hazardous substances." The court must assume that these allegations refer to additive packaging because that is the only waste that was generated on a daily basis.[284] According to Mr. Smith, the additive residues would have contained copper, zinc, lead, barium, nickel, and PAHs, EPA-designated hazardous substances.

The plaintiffs allege that LDS hauled waste containing hazardous by-products generated from Syracuse Rubber's mold-making process. Mold-making generated shavings mixed with oil and waste lubricant; the plaintiffs allege that "some of these oil-contaminated metal shavings were hauled by

---

dri-mix with diatomaceous eath; permanent red 2B CA salt; permanent red 2B BA salt; zinc oxide; naphthionic oil and carbon black; and zinc stearate.

279. Regenos Dep., at 122–123. Mr. Regenos' testimony as to the content of the roll-offs was not as definitive as the plaintiffs would suggest.

280. Fruit Dep., at 71.

281. Phillipy Dep., at 54–58.

282. *Id.,* at 55–57.

283. Call Dep., at 38–39, 181.

284. *See* Brief in Opposition, p. 89 (citing Allen Dep., at 17).

**1530**

LDS",[285] but the evidence does not support the allegation. The record indicates that these shavings were not in the waste hauled by LDS, but rather were collected and taken to a salvage yard for resale.[286]

The plaintiffs also allege that the waste hauled by LDS included (1) discarded five gallon buckets and small barrels containing cutting oil residues; (2) contaminated floor sweepings[287]; (3) discarded cardboard and plastic drums with residue of release agents; (4) contaminated rubber gloves and rags; (5) laboratory chemical containers; and (6) paint cans, rollers, and brushes. The plaintiffs cite portions of the record in support of these allegations, but the court cannot find anything in the cited materials that could establish that these wastes were hauled by LDS; rather, Mr. Eyer and Mr. Allen resoundingly testified that they either "did not know" or "did not remember" where the waste was disposed,[288] or that it "was possible" that the waste (floor sweepings) was disposed of in the roll-off containers picked up by LDS.[289] Mr. Sloan did not mention whether LDS hauled the discarded five gallon buckets and small barrels.[290]

The plaintiffs have presented no evidence or any methodology to establish which particular roll-off loads and compactor truck wastes were hauled from Syracuse Rubber and disposed of at the Site. As discussed below, the record cannot support a finding that even the majority of Syracuse Rubber waste was disposed of at the Site.

Nonetheless, for the reasons outlined in Part II–B of this opinion, the record supports a reasonable inference that hazardous waste from Syracuse Rubber was disposed of at the Site. The plaintiffs have presented evidence of a waste stream that consistently and predictably contained hazardous substances, and evidence that LDS drivers took a significant portion of that waste stream to the Site.

How great a portion went to the Site is an issue of fact. LDS disposed of most of the Syracuse Rubber waste at landfills other than the Site. Mr. Regenos testified that "generally", and as his "usual practice", he disposed of one of two Syracuse Rubber roll-offs at the Site.[291] Mr. Fruit, who testified that he picked up Syracuse Rubber waste "no more than once" a week, but "probably less" than once a week,[292] testified that he disposed of Syracuse Rubber waste at either the Site or at Scott's Landfill, located near Syracuse, Indiana.[293] Mr. Phillipy testified that he disposed of 99%–100% of that waste at Scott's Landfill. When asked whether he ever disposed of any of Syracuse Rubber waste at the Site, Mr. Phillipy responded, "Not to my knowledge."[294]

Mr. Call testified that he picked up Syracuse Rubber roll-offs and that he disposed of about 15% of the waste at the Site; the rest went to Scott's Landfill. Posey Lester recalled picking up waste at Syracuse Rubber, but could not recall whether he disposed of

---

285. Brief in Opposition, p. 92 (citing "Syracuse's 10/27/92 Response, No. 2"). The plaintiffs did not include "Syracuse's 10/27/92 Response No. 2" in their exhibits. Syracuse Rubber's exhibits containing relevant portions of responses to the plaintiffs' first and second set of interrogatories and requests for production of documents did not support the plaintiffs' allegation.

286. Sloan Dep., at 19.

287. The record establishes that the waste hauled by LDS contained floor sweepings, *see* Syracuse's 6/24/93 Resp. No. 1.i, but does not support a finding that those floor sweepings were contaminated with hydraulic and transmission oils. *See* Eyer Dep., at 31, 37–38, 45.

288. *See* Eyer Dep., at 39, 43, 46; Allen Dep., at 95–96.

289. *See* Eyer Dep., at 45.

290. Sloan Dep., at 26.

291. Regenos Dep., at 99, 123–124. The plaintiffs represent that Mr. Regenos testified that he always disposed of one roll-off at the Lakeland site. *See* Brief in Opposition, p. 87. The court's review of Mr. Regenos' deposition does not support that representation.

292. Fruit Dep., at 70–71.

293. *Id.*, at 62–63, 68.

294. Phillipy Dep., at 57.

any of that waste at the Site.[295] Don Conley testified that he picked up waste from Syracuse Rubber approximately once each week, but could not recall disposing of it at the Site.[296] David Lindsay testified that most of the Syracuse Rubber waste was disposed of at other landfills, and less than half was disposed of at the Site.[297]

Thus, the estimated portion of Syracuse Rubber waste disposed of at the Site by each driver ranged from half[298] to none,[299] and two drivers could not recall disposing of Syracuse Rubber waste at the Site. Thus, the percentage of Syracuse Rubber waste disposed of at the Site would fall between 0% and 50% of the waste actually hauled by LDS, most likely at the lower end of the range (calculating percentages per driver multiplied by six drivers).

Still, the evidence supports a reasonable inference that some significant share of Syracuse Rubber's continuous waste stream, including hazardous substances, reached the Site for disposal. Nothing more is required of the plaintiffs to survive summary judgment on the liability issue.

Syracuse Rubber's summary judgment motion must be denied.

### J. Zimmer, Inc.

■■ Zimmer, a medical supply company,[300] had five facilities in the Warsaw, Indiana area serviced by LDS intermittently between 1974 and 1978.[301] While a customer of LDS in 1974 and 1975, Zimmer used small containers that were emptied into a compactor truck. The LDS drivers who hauled Zimmer's waste in 1974 and 1975 testified that they hauled Zimmer's waste to both the Site and the Ransbottom Landfill in Packerton.[302] But there came a time when no Zimmer waste was hauled to the Site.[303] Larry Tillman estimated that he disposed of 60% of the Zimmer waste at the Ransbottom Landfill and 40% at the Site.[304] Don Conley stated that "[p]robably 50 percent" of the hauls he handled went to the Site.[305]

No LDS account records or roll-off records reflect that LDS hauled any waste for Zimmer from July 1975 through May 1977.[306] Zimmer contracted with a Zimmer employee, Don Sparks, for waste hauling and disposal services for a period of time between 1974 and 1978.[307] Mr. Sparks hauled the waste to his farm where he burned and covered it.[308] Mr. Sparks never saw any cans, bottles, or other such materials in Zimmer's waste.[309] Zimmer also utilized an on-site incinerator to burn its waste for a short time—less than a year—between 1974 and 1978.[310]

LDS resumed hauling Zimmer's waste in June 1977.[311] Mr. Shambaugh testified that

---

295. Posey Dep., at 211.

296. Conley Dep., at 154–56.

297. Lindsay Dep., at 469–470.

298. Testimony of Mr. Regenos and Mr. Fruit.

299. Mr. Phillipy's testimony.

300. Zimmer's activities during the relevant time period included sewing soft-good medical devices, printing, manufacturing hard and soft goods, machining metal products, electropolishing, molding of polyethylene devices, and manufacturing and molding epoxy powder coatings. Zimmer's Resp. and Objections to Pltfs' Second Set of Interrogatories, Res. No. 1(c); *see* Brief in Opposition, Exh. 14, Tab B(1).

301. Shambaugh Dep., at 241; Fruit Dep., at 44; Conley Dep., at 159.

302. *See* Tillman Dep., at 60; Fruit Dep., at 14, 44, 137, 138; *see also* Lindsay Dep., at 406–07.

303. Fruit Dep., at 21, 73–76, 139–141.

304. Tillman Dep., at 60.

305. Conley Dep., at 116.

306. Clarke Aff., ¶ 5; *see also* Brief in Opposition, Exh. 14, Tab (B)(2), p. 40 (summarizing LDS records relating to Zimmer prepared by John Tatum). Robert Clarke was employed with Zimmer from June 1, 1970 through his retirement on February 1, 1993. Clarke Aff., ¶ 2.

307. Sparks Dep., at 9; Newsome Dep., at 12.

308. Sparks Dep., at 9.

309. *Id.*, at 9, 11.

310. Guard Dep., at 57–58; Newsome Dep., at 68.

311. *See* Clarke Aff., ¶ 5; Brief in Opposition, Exh. 14, Tab (B)(2), p. 40 (summarizing LDS records relating to Zimmer prepared by John Tatum).

Zimmer's waste generally was taken to the Ransbottom Landfill.[312] Zimmer's waste also was taken to Scott's Landfill and the Site. The testimony of drivers working for LDS in 1977 is consistent with that of Mr. Shambaugh.[313] Roll-off and compactor truck waste was hauled to the Site only during a six month period to fill a trench.[314] Mr. Shambaugh had no recollection that any Zimmer waste was disposed of in the trench.[315]

From 1974 through 1978, Zimmer had several recycling and reclamation programs.[316] Zimmer disposed of metal chips generated during its manufacturing process into special containers for recycling, then sold the metal chips to Myer Levin & Sons, Inc.[317] Zimmer also disposed of oily wastes and special wastes—metal shavings coated with oil, used Grease-up (an oil absorbing granular clay material), hardened epoxy paint, empty paint cans, used paint brushes and rollers, sandblast media, and similar materials—in a special container.[318] LDS did not haul the special container.[319] Acids used for electropolishing were drummed and hauled by vendors other than LDS for recycling or reclamation.[320]

Wastes such as empty bottles and cans, photographic negatives, cloth squares with ink residue, and paper towels used to wipe oil off machines, occasionally were disposed of in the containers hauled by LDS.[321] Although Grease-up was disposed of in fiber drums or a special waste hopper for disposal, some Grease-up may have been thrown into the general trash.[322] Some metal chips, oily wastes,[323] paint buckets,[324] twelve paint brushes and rollers,[325] towels with ink residue,[326] and used containers of aerosol disinfectant[327] were seen in the general trash which was hauled by LDS.

Other than these occasional wastes, LDS hauled only general plant trash from Zimmer.[328] LDS drivers testified without contradiction that Zimmer's waste contained paper, cardboard, wooden pallets, cloth cuttings, and cafeteria and rest room wastes. With the exception of Robert Call, no LDS

---

**312.** Shambaugh Dep., at 241–43.

**313.** Don Conley and Paul Phillipy recalled that Zimmer waste went to Ransbottom or to the Site. Conley Dep., at 10, 158–160; Phillipy Dep., at 197. Mr. Phillipy could not say what percentage of the Zimmer waste he hauled went to the Site. Phillipy Dep., at 197. Larry Tillman, a compactor truck driver, remembered that most of Zimmer's waste went to the Ransbottom Landfill and the Site. Tillman Dep., at 60. Rick Fruit remembered that Zimmer waste initially went to the Site, Ransbottom, and Scott's, but later did not go to the Site. Fruit Dep., 21, 73–76, 139–141. Alan Regenos testified that he hauled Zimmer waste to the Site on one occasion. Regenos Dep., at 170–171. Posey Lester did not recall hauling trash for Zimmer. Lester Dep., at 47, 217–218.

**314.** *See* Phillipy Dep., at 198 (stating that for a short period of time he did not haul any Zimmer waste to the Site).

**315.** Shambaugh Dep., at 242–244.

**316.** Guard Dep., at 21, 22; Newsome Dep., at 30, 31, 76–77; Zimmer's Resp. to Pltfs' Second Set of Interrogatories, No. 1(j), (k), and (*l*); *see* Zimmer's Brief in Supp. of its Mot. for Sum. Judg., Attachment Q.

**317.** Guard Dep., at 21–23; Critchfield August 13, 1979 Mem., p. 1.

**318.** Guard Dep., at 21, 23–24, 32–33, 41–42; Newsome Dep., at 30–31; Critchfield August 13, 1979 Mem., p. 1.

**319.** Critchfield Mem., p. 1.

**320.** Lindsay Dep., at 274, 407; Shambaugh Dep., at 241–243; Critchfield Mem., p. 1.

**321.** Newsome Dep., at 19, 20, 24, 30, 34–39, 73, 80.

**322.** Newsome Dep., at 30–31; Guard Dep., at 41, 42, 47.

**323.** Newsome Dep., at 32, 45, 80.

**324.** *Id.,* at 39.

**325.** *Id.,* at 40.

**326.** *Id.,* at 26, 73–74.

**327.** *Id.,* at 35–36.

**328.** Lindsay Dep., at 274; Shambaugh Dep., at 241; Newsome Dep., at 67; Guard Dep., at 29. Zimmer's "lint and water" waste was disposed of by Weed & Sons, Inc., which used the waste as fertilizer on farmland owned by the Weed family. Weed & Sons did not haul any of the "lint and water" waste to the Site. B. Weed Aff., ¶¶ 4–7; L. Weed Aff., ¶¶ 4–7; Shambaugh Dep., at 525–28; Critchfield August 13, 1979 Mem. p. 1.

driver recalled seeing any bottles, cans, liquids, containers, powders, or hazardous substances in Zimmer's waste.

 The evidence could not allow a trier of fact to find by a preponderance that materials that were not otherwise recycled or reclaimed were regularly or consistently placed in the containers hauled by LDS. Moreover, the plaintiffs have offered no evidence to establish that any of the wastes containing allegedly hazardous substances were hauled by LDS to the Site. Mere generation of hazardous substances is not sufficient to establish CERCLA liability. *See, e.g., B.F. Goodrich v. Murtha,* 815 F.Supp. 539, 544 (D.Conn.1993). Mere speculation that materials contained hazardous substances is not sufficient to establish CERCLA liability. *See, e.g., United States v. Atlas Minerals & Chem.,* No. 91–5118, 1993 WL 518421, at *2 (E.D.Pa. Dec. 7, 1993).

Without the benefit of a continuous and predictable waste stream containing hazardous constituents, the plaintiffs ask the court to infer that LDS hauled the few containers of waste containing the occasional hazardous substance to the Site rather than to any other area landfill. However, the evidence does not establish that even the majority of Zimmer's waste was disposed of at the Site. The plaintiffs do not dispute that LDS hauled no Zimmer waste from July 1975 through May 1977, thus conceding that no Zimmer waste would have been disposed of at the Site during that time. Furthermore, the evidence establishes that Zimmer's waste was disposed at Ransbottom, Scott's, and the

Site. The plaintiffs have offered no evidence that more or most of Zimmer's waste was disposed of at the Site.

To the contrary, the evidence shows that Zimmer's waste was as likely, if not more likely, to be hauled to another area landfill. Larry Tillman estimated that he disposed of 60% of the Zimmer waste at the Ransbottom Landfill, and Don Conley stated that "[p]robably 50 percent" of the hauls he handled went to the Site. During a six month period in 1977, the Site accepted no Zimmer waste. The evidence does not support an inference that any load of Zimmer waste was more likely than not hauled to the Site; consequently, the evidence does not support an inference that any load of Zimmer waste that may have contained hazardous substances was disposed of at the Site.

The plaintiffs rely on the testimony of Robert Call and on records attached in Exhibit 14 to their Brief in Opposition to support their allegation that Zimmer sent drummed wastes (sludge) to the Site.[329]

The evidence, including deposition testimony, documents, and records, unequivocally refutes Mr. Call's testimony.[330] Mr. Call testified that he thought "there were some barrels that came out on Route 15 [from Zimmer]",[331] but later testified that, "I said to the best of my recollection, I did pick up drums there one time, but I could be wrong." [332] Mr. Call testified that he hauled a roll-off container from the Zimmer facility at Boggs Industrial Park. Mr. Call testified that the roll-off contained "miscellaneous trash, and I don't know. Looked like hose

---

**329.** *See* Brief in Opposition, p. 96 (citing Call Dep., at 45–46, 198–200, 259–260, 263, 415–419, 422); Brief in Opposition, p. 94 (referring to Exh. 14). The plaintiffs contend:

LDS picked up wastes from Zimmer with packer trucks and hauled compactor receptacles and roll-off containers with Zimmer wastes. Some of the wastes were in drums. LDS records evidencing such transactions are attached as Exhibit 14.

Brief in Opposition, p. 94. The documents and records in Exhibit 14 stand approximately six inches high. The plaintiffs have not indicated which, if any, of the hundreds of documents in Exhibit 14 support their contention that some of the wastes were in drums. The court need not

"scour" six inches of paper (Exhibit 14) in search of a document or documents which indicate that LDS hauled drums from Zimmer.

**330.** Even the plaintiffs' own expert, John Tatum, did not consider Mr. Call's testimony. Mr. Tatum's database of waste contributed by each defendant does not attribute any drummed waste or sludge waste to Zimmer during either the Lindsay or Shambaugh eras. Tatum Aff., Exh. B, Tab 2.

**331.** Call Dep., at 45.

**332.** *Id.,* at 426.

and stuff like that." [333]

■■ All other evidence indicates that LDS did not provide Zimmer with roll-off services during the Lindsay era, when Mr. Call was employed with LDS.[334] During the Lindsay era, Zimmer had only a small 1½ cubic yard, 3 cubic yard, or 4 cubic yard container that would have been emptied into a compactor truck. Testimony that is implausible given the entire record is insufficient to create a genuine issue of material fact. *See Czajkowski v. City of Chicago, Ill.*, 810 F.Supp. 1428, 1432 (N.D.Ill.1992). Mr. Call's testimony regarding the disposal of drums, which was tentative in any event, is implausible in light of the entire record. Mr. Call's testimony is insufficient, without more, to create a genuine issue of material fact as to the alleged disposal of drums; no reasonable factfinder, relying solely on Mr. Call's testimony, could find that it is more likely than not that Zimmer disposed of drums at the Site.

Even if Mr. Call disposed of the drums at the Site, the plaintiffs have not presented evidence sufficient to establish, by a preponderance of the evidence, that those drums contained hazardous substances. Mr. Call had no knowledge of the contents of the drums; he testified that the drums "were basically covered".[335] He did not remember whether there were any labels on the drums, but did recall that the drums were a variety of colors.[336]

To establish that the drums contained hazardous substances, the plaintiffs assert that "Zimmer kept several kinds of waste in 55 gallon drums, including waste solvents, residue from its dry dust collection system, electropolishing acids, caustic wastes, and waste oil".[337] The plaintiffs further contend that the drums "may" have contained other hazardous substances which Zimmer used at its plants during the time period (1973 to 1978)—hydrochloric, nitric, sulfuric and phosphoric acids, denatured alcohol, acetone, xylene, and freon.[338] Relying on the Smith affidavit, the plaintiffs contend that "all these substances[339] contain hazardous substances".[340] As previously discussed, however, the generation of hazardous materials is insufficient to establish disposal of those substances, and the Smith affidavit offers nothing additional to establish disposal.

The evidence does not support an inference that any load of Zimmer waste hauled by LDS contained hazardous substances, that any particular load of Zimmer waste was disposed of at the Site, or that any load of Zimmer waste that actually contained hazardous substances was disposed of at the Site. Thus, the plaintiffs have failed to establish by a preponderance of the evidence that any hazardous substance allegedly generated by Zimmer was disposed of at the Site, and Zimmer is entitled to summary judgment.

Accordingly, the court finds that Zimmer's motion for summary judgment must be granted.

## IV. CONCLUSION

For the foregoing reasons, the court:

selves are uncertain whether the drums contained wastes containing such hazardous substances, as evidenced by the plaintiffs' use of the word "may". Second, and more significantly, the plaintiffs have not presented evidence that Zimmer's use of hazardous substances corresponds to disposal of hazardous substances in any drums. The plaintiffs have offered no evidence to show how Zimmer used these substances or how Zimmer disposed of these substances, if indeed the substances were not "used up".

**339.** Presumably paints, inks, waste oils, filters, and residue. Smith Aff., ¶ 48.

**340.** Brief in Opposition, p. 97 (citing Smith Aff., ¶¶ 47–49).

---

**333.** Call Dep., at 42–43.

**334.** *See* Lindsay Dep., at 407; Tillman Dep., at 60.

**335.** Call Dep., at 200, 415.

**336.** *Id.*, at 415.

**337.** Brief in Opposition, pp. 96–97 (citing Zimmer's Resp. to Pltfs' Second Set of Interrogatories, Resp. Nos. 1(f)–(k)); *see* Brief in Opposition, Exh. 14, Tab (B)(1).

**338.** Brief in Opposition, p. 97. This contention is sheer speculation and creates no genuine issue as to whether Zimmer's waste contained such hazardous substances. First, the plaintiffs them-

(1) DENIES the motion of American Standard, Inc. for leave to file a supplemental brief (filed September 22, 1994 (# 570));

(2) DENIES the motion of Syracuse Rubber Products, Inc. for leave to file supplemental memorandum (filed September 22, 1994 (# 568));

(3) DENIES the plaintiffs' request for an opportunity to file supplemental materials;

(4) GRANTS IN PART AND DENIES IN PART Huber, Hunt & Nichols' motion to strike affidavits (filed June 27, 1994 (# 526));

(5) GRANTS the motion for summary judgment filed by American Standard, Inc. (filed April 18, 1994 (# 474));

(6) GRANTS the motion for summary judgment filed by the City of Warsaw (filed April 18, 1994 (# 472));

(7) GRANTS the motion for summary judgment filed by The Dalton Foundries, Inc. (filed April 28, 1994 (# 502));

(8) GRANTS the motion for summary judgment filed by GTE North, Inc. (filed April 18, 1994 (# 495));

(9) GRANTS the motion for summary judgment filed by Huber, Hunt & Nichols, Inc. (filed April 18, 1994 (# 489));

(10) GRANTS the motion for summary judgment filed by K–Mart Corporation (filed April 18, 1994 (# 468));

(11) GRANTS the motion for summary judgment filed by Liberty Homes, Inc. (filed April 18, 1994 (# 477));

(12) GRANTS the motion for summary judgment filed by R.R. Donnelley & Sons Company (filed April 18, 1994 (# 480));

(13) DENIES the motion for summary judgment filed by Syracuse Rubber Products, Inc. (filed April 18, 1994 (# 484)); and

(14) GRANTS the motion for summary judgment filed by Zimmer, Inc. (filed April 18, 1994 (# 493)).

SO ORDERED.